UNITED STATES of America

v.

James K. GREEN, Appellant.

No. 80–2461.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 16, 1981.

Decided May 21, 1982.
Opinion on Denial of Rehearing and
Rehearing En Banc July 16, 1982.

Charles G. Cole, Washington, D. C. (appointed by this Court), for appellant.

Susan R. Holmes, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, and WILKEY and WALD, Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by Senior Circuit Judge BAZELON.

PER CURIAM:

In this appeal, James Green challenges the district court's denial without a hearing of his motion under the federal habeas corpus statute, 28 U.S.C. § 2255. Green sought modification of the 10–30 year pris-

on sentence imposed after his conviction of armed rape, armed robbery, armed burglary and assault with and possession of a dangerous weapon. Green did not dispute the validity of the underlying convictions which were upheld on appeal in 1970;[1] the issue before the district court was whether Green had been denied due process or his sixth amendment right to effective assistance of counsel at the sentencing. Section 2255 does not require the district court to hold a hearing on the motion if "the files and records of the case conclusively show that the prisoner is entitled to no relief," and the district court so decided here. We hold that the district court's appraisal of the record was correct and that Green was not entitled to relief. He was neither denied due process at the sentencing stage nor was his sentence tainted by ineffective assistance of counsel under the standards set forth in *United States v. Decoster*, 624 F.2d 196 (D.C.Cir.) (*en banc*), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979).

## I.

Green was represented at his five-day trial by retained counsel of his choice. On November 6, 1968, the jury found Green guilty of the armed rape and robbery of a Washington, D. C. resident in her home. He was also found guilty of first degree burglary and illegal assault with and possession of a loaded gun. The facts of the crime were recounted by the district court:

> The defendant followed Mrs. Lilia Pearce, a 26-year old, white female into her residence on March 27, 1968. He waited until she was leaving again and asked her where the janitor was located. Mrs. Pearce took the defendant downstairs, where he shoved her into a corner, pointed a gun at her head, and threatened to kill her if she would not give him her money. He then pulled her back up the stairs to her apartment. Once inside, he forced her into each room, asking what

she had of value. Mrs. Pearce turned over $100.00. The defendant then forced Mrs. Pearce onto the bed where he made her take off her clothes and then had sexual relations with her. When he finished, he tied her hands, gagged her and forced her into a closet, against which he put a duffel bag before leaving.

*United States v. Green*, No. 729–68 at 1 (Nov. 7, 1980) (memorandum order denying § 2255 motion).

Subsequent to Green's conviction, the probation office for the district court prepared a presentence report, which detailed both the government's and Green's versions of the offense, explained that Green had no previous arrest record (though he was AWOL from the Army at the time of his offense), discussed various aspects of his background, and concluded with an "Evaluative Summary." The evaluative summary contained a review of Green's personal history and attitudes including observations on his propensity to "project responsibility onto others, particularly the police, the Assistant U. S. Attorney, and even his own lawyer." The report summed up with the comment that "[i]n any event, it would seem that the conviction and circumstances of the offense outweigh other considerations. In all likelihood, Green presents a real threat to others in the community, should he again choose to victimize someone."[2] The presentence report also included the statement that "Green said he felt his lawyer was incompetent and that, perhaps there was a conspiracy between his lawyer and the Assistant U. S. Attorney," although Green could offer no motivation for such a conspiracy.

Green's sentencing hearing, at which he was represented by trial counsel, was held on January 3, 1969. We quote the hearing transcript virtually in its entirety:

> [COUNSEL]: In this case, if it please the Court, I am almost in a position

---

1.  *United States v. Green*, 436 F.2d 290 (D.C.Cir. 1970) (*per* Bazelon, C.J.) upheld his conviction for first degree burglary while armed, D.C.Code § 22–1801(a); robbery, § 22–2901; rape while armed, § 22–2801; assault with a dangerous

weapon, § 22–502; and carrying a dangerous weapon, § 22–3204.

2.  Presentence Report at 6.

where I feel I need counsel, for this defendant, I think I should say for the record, has totally repudiated this humble counsel.

THE COURT: I don't hear you.

[COUNSEL]: I say this defendant has totally repudiated this humble counsel and so all I can say is that this is a young man. He is in military service. I think that there must be within him seeds for rehabilitation. The Court has a total probation record on James K. Green, and I am sure the Court remembers the trial for we went through it for several days and in at least this counsel's opinion tried as best we could to give him full and fair representation.

THE COURT: Indeed, it was the Court's opinion that he was afforded the finest of counsel.

[COUNSEL]: So we would therefore submit him to the Court and ask the Court to hear him say anything he desires to say.

THE COURT: Mr. Green.

THE DEFENDANT: Your Honor, I would like to ask the Court a couple of questions, if I may.

THE COURT: You just tell us what you have to say. The Court isn't interrogated.

THE DEFENDANT: I have nothing to say.

THE COURT: Nothing to say? . . . [T]he Court sentences the defendant James K. Green to be incarcerated for a period of not less than ten years nor more than thirty years in a penal institution to be designated by the Attorney General or his authorized representative. You have ten days in which to note an appeal.

[COUNSEL]: Your Honor, I will go down immediately and get the necessary forms and furnish them to the defendant. I feel that this is my duty. And after that I ask the Court that I be relieved in this case.

THE COURT: There is a new rule of the Court that you may be familiar with, that asks that trial counsel stay on to assist counsel who may be appointed in the appellate case.

[COUNSEL]: Of course I will be happy to do that.[3]

On Green's appeal of his convictions, he was represented by new counsel appointed by this court. The convictions were affirmed by a unanimous panel in an opinion written by then Chief Judge Bazelon. In the course of that appeal, new counsel did not raise any issue regarding error in Green's sentencing nor allege ineffective assistance of counsel at any stage of the proceedings. While the appeal was pending, Green brought a *pro se* motion for a new trial alleging ineffective assistance by virtue of counsel's failure to file certain pretrial motions, but did not mention any defects in either the trial or the sentencing process. That motion was denied without opinion, and no appeal was taken.

Green served four years of his 10-year sentence and then escaped from prison, remaining free from 1973–1977. Upon his recapture, he was sentenced to an additional year in prison. In January 1982, he was released to the community under parole supervision.

Green had filed his habeas motion *pro se* on August 7, 1980, some 11½ years after his conviction, claiming that he was sentenced on the basis of willfully false and prejudicial information in the presentence report,[4] and that he was denied effective assistance of counsel at the sentencing hearing[5] in that counsel did not disclose to him the contents of the presentence report nor seek to correct purported errors in the report before the sentencing judge. The only reference he made to any conflict or rift between them at the time of sentencing which might have adversely affected her representation of him was his speculation that she was "concerned" about the dissatisfaction

3. Transcript of Sentencing Hearing at 1–2.

4. Appellant's Motion to Vacate, Set Aside, or Correct Sentence at pp. 1–3 of attachment.

5. *Id.* at p. "1–B" of attachment.

with her that he had expressed in the presentence report. In accordance with the rules governing section 2255 proceedings, 28 U.S.C. foll. § 2255 Rule 4(a), Green's motion was referred to the district judge who had originally sentenced him. In opposition to Green's motion, the government filed affidavits by the author of the presentence report and by defendant's trial counsel to show that Green's allegations of errors in the report were either incorrect or immaterial [6] and that Green's attorney had given him competent representation.[7] Counsel's affidavit stated that she *had* reviewed the presentence report with Green, and that though Green was unhappy with the report, counsel found it "accurate in all material respects" and "consistent with counsel's impressions of Mr. Green and with the information he had given [counsel] about himself." The affidavit also claims that although Green had asked counsel to correct the report, he did not provide counsel with "any legal or factual basis for these wishes." Furthermore, counsel "believed it would be unwise, tactically, to challenge the report in the manner suggested by the defendant." Counsel did, however, advise Green that he could voice his objections to the court at the sentencing hearing. Finally, the affidavit states: "I knew that Mr. Green was displeased with me in this regard and I so advised the Court, but I did not seek to withdraw because Mr. Green himself asked me to remain in the case."

The record having been thus supplemented, as permitted by the section 2255 rules, 28 U.S.C. foll. § 2255 Rule 7,[8] the district

court chose to avail itself of those procedures that "enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." *Blackledge v. Allison*, 431 U.S. 63, 82, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977). Upon examination of the "files, records, transcripts, and correspondence relating to the judgment under attack," 28 U.S.C. foll. § 2255 Rule 4(b), to determine whether the "facially adequate allegations [had] sufficient basis in fact to warrant plenary presentation of evidence," 431 U.S. at 80, 97 S.Ct. at 1632, the court denied Green's motion without an evidentiary hearing. *Cf. United States v. Boggs*, 612 F.2d 991 (5th Cir.), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980) (no need for evidentiary hearing where district judge who dismissed defendant's motion was same judge who imposed sentence and was familiar with defendant's situation). The memorandum order defining the reasons for dismissing the due process and competence claims, stated that "[t]he alleged errors pointed to in the presentence report" had not been "material to the Court's determination of sentence." *United States v. Green, supra*, at 1. Rather, the memorandum order recalls that the court had "read the entire record including the presentence report, and it relied primarily on the facts of the crime and the trial testimony in making its sentencing decision," *id.* at 2, and, additionally, that Green's counsel had represented him competently, *id.* at 3. Green appealed the district court order of

---

**6.** Opposition to Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 at 2–6.

**7.** *Id.* at 6–8.

**8.** Rule 7, entitled "Expansion of Record," provides:

(a) Direction for expansion. If the motion is not dismissed summarily, the judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the motion.

(b) Materials to be added. The expanded record *may include, without limitation*, letters predating the filing of the motion in the district court, documents, exhibits, and an-

swers under oath, if so directed, to written interrogatories propounded by the judge. Affidavits may be submitted and considered as a part of the record.

(c) Submission to opposing party. In any case in which an expanded record is directed, copies of the letters, documents, exhibits, and affidavits proposed to be included shall be submitted *to the party against whom they are to be offered*, and he shall be afforded an opportunity to admit or deny their correctness.

(d) Authentication. The court may require the authentication of any material under subdivision (b) or (c).

dismissal to this court and counsel was appointed on his behalf.

## II.

We dispose first of Green's principal attack that he was sentenced on the basis of prejudicial and willfully false material supplied by the probation officer. We note that Judge Bazelon's dissent agrees that Green has made out no case on this ground. Diss. Op. at 192 n.3. Relying on *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), and *United States v. Bass*, 535 F.2d 110 (D.C.Cir.1976), appellant's due process claim rests on the assertion that he was sentenced on the basis of materially false information. In *Townsend*, "the Supreme Court held that the due process clause was violated when a defendant . . . 'was sentenced on the basis of assumptions concerning his criminal record which were materially untrue.'" *United States v. Bass*, 535 F.2d at 118 (quoting *Townsend v. Burke*, 334 U.S. at 741, 68 S.Ct. at 1255). Beyond the fact that the district court expressly recalled that the challenged statements in the presentence report were not material to the determination of the sentence, the record shows that the presentence report did not contain materially "false assumptions." *Townsend v. Burke*, 334 U.S. at 740, 68 S.Ct. at 1255.

Green's motion lists six inaccuracies in the presentence report. First, Green complains that the report stated that bail was denied him due to the Bail Agency's inability to find community ties. The transcript of Green's preliminary hearing on April 9, 1968, shows that the presiding judge set bail at $25,000 because of the strength of the case against Green and because Green was not at that time a resident of the District of Columbia. Transcript of Preliminary Hearing at 34–37. Green remained incarcerated, and filed a *pro se* motion for release on personal bond on August 8, 1968. The Bail Agency submitted its report on August 15, 1968, recommending against release on personal recognizance because it had been unable to verify the information supplied by Green. A hearing on Green's motion was, according to a notation in the district court record, "continued pending report from military." Court Clerk's Memorandum for August 30, 1968. In sum, the presentence report was substantially correct on this point.

Green next disputes that the author of the report was unable to locate the District Roma Bakery where Green reported that he had worked for five or six years prior to his induction into the Army. He claims that no attempt was made to contact his former employer, and submitted with his motion a listing in the 1976 District of Columbia phone book for a "Roma-Italian Bread Corp." at the same address he had given the probation office in 1968. The government, however, submitted with its Opposition an envelope supporting the contention that a request for information was sent to "District Rona Baking Company" at 1644 North Capitol Street and was returned marked "Moved, left no address." Further, the report did not infer from the failure to locate the company that Green had lied. On the contrary, the report assumed that Green resigned from a previous job "to work for the baking company."

Green also objected that the report implied that he was "a person who tells lies" through the account that "According to military records, Green entered the service not in March of 1967, as he said, but on October 6, 1967." The government concedes that the report is in error, but, in the absence of any indication that Green had something to gain from a misrepresentation, the error does not render the report prejudicial, and was certainly not "material."

Green's fourth objection to the report is the characterization, in the evaluative summary, of his relationship with his natural father:

> Green has occasionally maintained contact with his natural father, though he never really assumed any parental responsibility for Green.

Appellant disputes the accuracy of this statement with a statement from his natural father that "my son . . . has always had my Moral and Financial support." Green,

however, does not otherwise dispute the report's account of his family history which describes a close relationship between Green and his stepfather, who, with Green's mother, "provided adequately for him," since Green was two years old and who "expressed concern about the offense for which he has been charged . . . and continue[d] to support him despite his incarceration." Thus, Green does not reject the basis for concluding that his stepfather, rather than his natural father, assumed the parental role in the nuclear family.

Green's final objections address statements in the report which on their face are clearly the opinions of the author and not "assumptions" at all. The author states that Green's "style of dress and behavior seemed to indicate effeminate characteristics, but he denied ever engaging in homosexual activities," and that "it would seem that the conviction and circumstances of the offense outweigh other considerations. In all likelihood, Green presents a real threat to others in the community . . . ."

Green's allegations, neither individually nor in the aggregate, establish the report as "materially false," and, therefore, Green's due process claim must fail.

### III.

With regard to his claim of ineffective assistance, Green makes three allegations on appeal. First, he claims that trial counsel did not discuss the presentence report with him nor disclose its contents. Green's supposition is that trial counsel was concerned about the presentence report's account of Green's dissatisfaction with counsel. Second, Green alleges that trial counsel made no other attempt to verify or refute the information in the report. Third, he argues that trial counsel provided ineffective assistance by failing to comment on the inaccuracies in the report or otherwise effectively advocate at the sentencing hearing. Green attributes the 11½ year

delay in filing his motion to his prior lack of knowledge of the contents of the report, but does not explain how he came by it at this late date.[9]

■ We do not suggest that counsel's preparation for and conduct at the sentencing hearing was a model of vigor. And we agree that Green "was as much entitled to effective representation by counsel at sentencing as at any other critical stage of his trial." United States v. Pinkney, 543 F.2d 908, 914 (D.C.Cir.1976); see American Bar Association Project on Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures § 5.3(e) (1968) ("The defense attorney should recognize that the sentencing stage is the time at which for many defendants the most important service of the entire proceeding can be performed."). But we do not find it necessary to decide whether counsel's conduct constituted "a serious incompetency that [fell] measurably below the performance ordinarily expected of fallible lawyers." United States v. Decoster, 624 F.2d 196, 208 (D.C.Cir.) (en banc) (plurality opinion per Leventhal, J.), cert. denied, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). This court has repeatedly maintained that to establish a deprivation of the sixth amendment's guarantee, absent a "governmental impediment to effective assistance of counsel," 624 F.2d at 214, "the accused, though ineffectively represented, must further show a likelihood of harm therefrom, and that only then does the government face the need to disprove actual injury." United States v. Wood, 628 F.2d 554, 561 (D.C.Cir. 1980) (Robinson, J., concurring in part and dissenting in part). See United States v. Hinton, 631 F.2d 769, 771 (D.C.Cir.1980) (per Bazelon, J.); United States v. Decoster, 624 F.2d at 208.

■ In Decoster, this court considered en banc the appeal of a conviction challenged

9. It is quite possible that in anticipation of a parole hearing in 1981, he was allowed access to the report. The Parole Act requires the Parole Commission to provide to a requesting prisoner in advance of any parole determination "reasonable access to a report or other document to be used by the Commission in making its determination." 18 U.S.C. § 4208(b)(2).

on the basis of ineffective assistance of counsel. Each of the appellant's various claims of defective performance were rejected in turn because the appellant failed to show that the attorney's failings had a likely impact on the result of the trial. We also said in *Decoster* that, depending on the nature of the claim, differing standards obtain to establish a violation of the sixth amendment guarantee that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." Where the government refuses to make counsel available to an indigent defendant or where the government interferes to restrict effective representation, a *per se* rule applies that the conviction be reversed. *See United States v. Decoster*, 624 F.2d at 201 (*citing, inter alia, Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). "At the other end of the continuum are cases, including the present one, in which the issue is counsel's performance when . . . 'untrammeled and unimpaired' by state action." 624 F.2d at 202 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978)). Judge Leventhal's opinion adopted the view that in such a case, "involving the quality of performance, as reflected in acts or omissions at trial," 624 F.2d at 203, the defendant must demonstrate "a likelihood of effect on the outcome." 624 F.2d at 215. A *per se* rule may serve a deterrent purpose where government action is involved, but no such justification exists for vacating a trial court's judgment when only individual counsel's allegedly incompetent behavior is implicated. *But cf.* Address by the Honorable David L. Bazelon, Robert S. Marx Lectures, U. of Cincinnati (Dec. 6–7, 1972), *reprinted as The Defective Assistance of Counsel*, 42 U.Cin.L.Rev. 1, 30 (1973) (if specific breaches of counsel's duty of care were presumed to be sixth amendment violations, courts would develop clear standards of performance). Where deterrence of unconstitutional government action is

not at issue, then, our concern must be focused on whether the defendant has suffered a palpable injustice as a result of counsel's substandard performance. *See United States v. Decoster*, 624 F.2d at 214.

■ This case falls squarely within the category which concentrates on the possible injustices in the individual case, and here appellant has made no showing of "likelihood of effect on the outcome." In fact, the record shows just the reverse. The single disputed issue of fact, *i.e.*, whether counsel showed Green the presentence report, is immaterial because Green has failed to show that any harm likely resulted, even if his version of the facts is credited. Green argues that he could have identified errors and omissions for counsel. He further argues that counsel should have verified and brought to the court's attention favorable evidence of Green's employment history, work habits and positive family relationships in order to correct the impression that Green had lied to the probation officer about his place of employment, and to alert the court to Green's previous stability and reliability. But, as the dissent apparently concedes, the report was substantially correct, did not imply that Green had lied about his employment, and not unfavorably described his home environment. Green has identified no additional facts that might have been raised by counsel to sway the judge toward leniency. Further, while the district court judge was satisfied with counsel's competence and so did not address the likelihood that Green was prejudiced by his attorney's alleged incompetence, the judge effectively ruled out the possibility of prejudice emanating from the alleged deficiencies in counsel's performance. She has specifically said that in imposing a 10–30 year sentence she "relied primarily on the facts of the crime and the trial testimony," [10] that she had read the entire presentence report and that "the alleged errors . . . were not material" to her determination, and "that the defendant's actions merited the imposition of the sentence given."

---

**10.** The defendant had already testified at trial at which time his past employment and family

situation were discussed at some length. *See* Trial Transcript at 442, 466–67.

*United States v. Green, supra,* at 1, 2. We have no reason to doubt the validity of the court's statement about the reasons for the sentence. It is not to be overlooked that a jury had found Green guilty of armed rape, armed robbery, and burglary, and the judge had authority to impose three indeterminate sentences up to life imprisonment, concurrently or consecutively. *See* D.C. Code §§ 22–3202 (additional penalty for committing crime when armed), 22–2801 (rape). The rules governing federal habeas proceedings provide for habeas motions to be referred to the trial judge precisely because that judge "is familiar with the facts and circumstances surrounding the trial, and is consequently not likely to be misled by false allegations as to what occurred." 28 U.S.C. § 2255 Rule 4, Advisory Committee Note (quoting *Carvell v. United States,* 173 F.2d 348, 348–49 (4th Cir. 1949). *Cf. Farrow v. United States,* 580 F.2d 1339 (9th Cir. 1978) (*en banc*) (practice of all other circuits to deny section 2255 motion challenging sentence possibly influenced by invalid prior conviction(s) if district court determines that, treating prior convictions as void, sentence is still appropriate). The court's explanation of the disposition of the motion precludes a finding of likely prejudice.[11]

▮ It is at best pure speculation that more eloquent pleading would have resulted in a lower sentence. In any case, such conjecture does not rise to the level of a showing of likely prejudice. The trial judge has looked at the allegations, taken them seriously enough to write a memorandum opinion stating that a hearing would be futile. If we were to insist on such a hearing we would be saying that a trial judge who imposes a sentence well within statutory bounds for major felonies, after a full-scale trial and upon a presentence report in which no material error has been found, must hold a hearing on a claim raised for the first time 11½ years later that better allocution *might have* reduced the sentence.[12]

**11.** The dissent attempts to draw formalistic distinctions to challenge the relevance of the trial court's statements regarding the basis of its sentencing decision in establishing lack of prejudice. The district court's explanation that the sentence was based primarily on the facts of the crime came specifically in response to the argument that the inaccurate and incomplete report misled the court. The court had before it the corrections and additions to the report that Green claims ought to have been offered initially. In the face of this, the court reaffirmed the sentence as merited by the defendant's conduct. In this context, such an affirmation by the very judge that imposed the sentence amounts to the same thing as saying that the additional information and argument that Green asserts should have been proffered would not have affected the sentencing decision. True, the district court did not state that a more adequate and helpful performance by counsel could not have had any effect on the sentence. But neither had appellant provided any substantive omissions from either the presentence report or allocution that might realistically have affected the outcome. It is beside the point that some hypothetical, unspecified additional information conceivably "might" have resulted in a different sentence, because the inquiry is whether Green has shown that his sentence *likely* would have been reduced. *Cf.* 28 U.S.C. foll. § 2255 Rule 4 (note) ("petition is expected to state facts that point to a 'real possibility of constitutional error' "). The unanchored potentiality of harm cannot justify overriding the justice system's special concerns on collateral attack "such as respect for finality of judgments and conservation of judicial resources." *United States v. Decoster,* 624 F.2d at 207. *Cf. id.* ("direct appeal gives more latitude to the court").

**12.** The dissent attempts to categorize this case as one of conflict of interest where no prejudice need be shown. As Judge Bazelon has previously observed, prejudice is presumed from lack of loyalty, but appellant "must first demonstrate that there has been a breach of loyalty in order for that presumption to be operative." *United States v. McCord,* 509 F.2d 334, 353 n.69 (D.C.Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975) (denying hearing on habeas claim that counsel did not fully represent client's interests). In *Cuyler v. Sullivan,* 446 U.S. 335, 349, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (denying habeas corpus on claim of potential conflict of interest where attorneys represented multiple defendants), the Supreme Court cautioned: "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S. at 350, 100 S.Ct. at 1719. If all rifts of the type that develop between disappointed defendants and their trial attorneys were to be characterized as conflicts of interest or "disabling irreconcilable differences," rarely could trial attorneys represent their clients at sentencing. Not only is

In the end, the totality of circumstances does not leave us with the impression that an injustice has been suffered. Hence, we affirm.

BAZELON, Senior Circuit Judge, dissenting:

Sentencing is the most important part of the typical criminal trial. Effective legal representation at sentencing is critical to meeting society's urgent interest in reaching determinations that accurately and fairly build upon the past and honestly attempt to create hope for the future. The majority opinion in this case holds that James K. Green is not even entitled to an evidentiary hearing on his claim of ineffective assistance of counsel at sentencing, because, according to the majority, Green "has made no showing of 'likelihood of effect on the

such a broad definition of disabling circumstances inconsistent with an attorney's obligation to continue representation absent "compelling" considerations, Model Code of Professional Responsibility EC 2–32 (1979), but this court has defined conflicts which corrupt the attorney-client relationship more narrowly, *i.e.*, instances "when counsel's duty to his client calls for a course of action which concern for himself suggests that he avoid." *United States v. Hurt*, 543 F.2d 162, 166 (D.C.Cir.1976) (appellate counsel's unreasonable but genuine subjective fear of libel suit rendered him unable to press claim of ineffective assistance of trial counsel). *See United States v. Barnes*, 662 F.2d 777 (D.C.Cir.1980) (conflict present when attorney whose performance on appeal was at issue called upon by court to represent client at section 2255 hearing).

The dissent attempts to gut the *Decoster* prejudice requirement by transforming this into a "loyalty" case. It purports to establish an actual conflict of interest by restating counsel's alleged deficiencies and by fiat ascribing Green's expressed unhappiness with counsel as their cause. While "actual" conflict exists where "potential" conflict " 'adversely affect[s] ... counsel's performance,'" Diss.Op. at 194 n.11, the dissent fails to show that "potential" conflict, as opposed to other factors, affected counsel's performance. Even if "potential conflict" is posed by Green's not atypical disappointment at his attorney's inability to exonerate him, we are left adrift as to why we should assume here that counsel's sensitivity to criticism was such as to prompt her to (1) avoid discussion of the report with Green (assuming this is true), (2) fail to supplement the report with favorable information, or (3) abbreviate the presentation at allocution. "Vague" and "conclusory" allegations will not suffice even to raise the issue, let alone establish the existence of a conflict of interest. *Blackledge v. Allison*, 431 U.S. at 75 & n.7, 97 S.Ct. at 1630 & n.7. *See* text following note 8 *supra*. In an attempt to establish a causal connection, the dissent suggests that to defend her client's character, counsel's sentencing presentation should have questioned the adequacy of her representation at trial. The weakness of this suggestion as a basis for establishing a conflict of interest is best demonstrated by the cumulation of speculations and tenuous connections the dissent employs to attempt to make the point. Diss.Op. at 194 (effective presentation at sentencing "could easily have" included argument that Green was more mature than indicated in report; such argument "could easily have" required counsel to recognize validity of Green's complaints about counsel). Similarly, the dissent attributes counsel's brevity at allocution to "irreconcilable differences" even while conceding that "[t]he exact nature of the causal relationship may not be certain." Diss.Op. at 195. In sum, the record is woefully inadequate to show a conflict of interest or irreconcilable differences. We are a long way from a situation where an attorney owes a duty to a client that threatens the attorney's self-interest, *e.g., United States v. Barnes, supra*, or clashes with a duty owed by the attorney to another, *e.g., Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). The dissent would have us hold that any expression, no matter how vague, of client dissatisfaction combined with allegations of counsel's deficiency, no matter how minimal, is sufficient to make a showing of breach of loyalty. An elementary appreciation of the realities of the criminal process suggests that this approach would eliminate the prejudice requirement in the vast majority of incompetency cases. Although the dissent marshalls "characteristic eloquence" in its "expression of aspirations for the legal system," *United States v. Decoster*, 624 F.2d at 214 (commenting on Judge Bazelon's dissent), we remain concerned with "tenable standards," *id.*, and will not *sub silentio* overrule *Decoster* by formulating an exception that swallows the rule.

The absence of a cognizable conflict also disposes of appellant's contention that the sentencing judge ought to have inquired into the nature of the "problem" between Green and his counsel. Contrary to the arguments advanced by appellant and the dissent, "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Cuyler v. Sullivan*, 446 U.S. at 347, 100 S.Ct. at 1717. As no actual conflict has been shown even yet, the sentencing judge could hardly have had notice of it.

outcome.' " [1] In the course of reaching that conclusion, however, the majority (1) dismisses in a single unconvincing footnote that part of Green's Sixth Amendment claim that concededly does *not* depend on a showing of "likelihood of effect on the outcome"; (2) so construes the "likelihood of effect" test as to that part of the claim for which it *is* appropriate so as to virtually gut any attempt to insure the competence of counsel during the sentencing phase of criminal proceedings; (3) conjures out of the district court opinion a crucial finding that the district court never in fact made; and (4) mistakenly dismisses the claim that the sentencing judge should have inquired at the sentencing hearing into the possibility that Green was being denied his Sixth Amendment rights. Because I believe that the "motion and the files and records of the case" do not "conclusively show" that Green is entitled to no relief,[2] I respectfully dissent.[3]

The first part of this opinion discusses my serious concern that the relationship between James Green and his counsel was probably so fundamentally flawed by the time of his sentencing hearing as to have left him effectively unrepresented—or worse—at the hearing. Specifically, it examines the evidence already in the record pointing to the existence of conflicts of interest and disabling irreconcilable differences between Green and his counsel, and explains why Green is entitled to an evidentiary hearing on both these related issues. It also demonstrates why neither of these defects would require an independent showing of prejudice in order to constitute a violation of the Sixth Amendment.

The next part of the opinion examines the district court judge's duty at the time of sentencing. It explains why, even if the

defects in the relationship between Green and his counsel were not as serious as I suspect them to be, we should remand for an evidentiary hearing to determine whether the *possibility* of a constitutional deprivation should have been evident enough at the time of sentencing that the sentencing judge's failure to make a thorough inquiry at that time was itself a violation of the Sixth Amendment.

Finally, the opinion turns to the issue upon which the majority opinion most clearly focuses—the claim of incompetence of counsel—and discusses why, contrary to the majority's analysis, Green has made a sufficient showing under both prongs of the test articulated in *United States v. Decoster*, 624 F.2d 196 (D.C.Cir.) (plurality opinion), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), to warrant an evidentiary hearing. That section of the opinion concludes with some general observations about the implications of the majority's position for this court's oversight of the critically important process of criminal sentencing.

## I. THE ATTORNEY–CLIENT RELATIONSHIP

Whatever other standards the Sixth Amendment may impose on the conduct of counsel in criminal cases, "[t]he first essential element of effective assistance of counsel is counsel able and willing to advocate fearlessly and effectively." *United States v. Hurt*, 543 F.2d 162, 167–68 (D.C.Cir.1976). "Complete fidelity of a lawyer to his client is an essential element of the existence of the [lawyer-client] relationship." *United States v. Decoster*, 624 F.2d 196, 236 n.51 (D.C.Cir.) (MacKinnon, J., concurring), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979) (*Decoster III*). Such

---

1. Maj. op. at 189.

2. *See* 28 U.S.C. § 2255 (1976).

3. I do concur in Part II of the majority opinion, which affirms the district court's finding that Green is not entitled to an evidentiary hearing on his claim that he was sentenced on the basis of materially false information. I do not take this holding to mean, however, that the sen-

tencing report was a sufficient or complete account of Green's character and background. Nor do I believe that the district court's finding in any way negates the possibility that the sentencing decision would likely have been influenced by countervailing or supplementary information or insights supplied by counsel. *See* pp. 201–202 *infra*.

"complete fidelity" is clearly lacking when there is a conflict of interest between lawyer and client. *See United States v. Barnes*, 662 F.2d 777, 781–82 (D.C.Cir.1980); *United States .v. Hurt, supra.*[4] It is also absent when there are such irreconcilable differences between lawyer and client that the lawyer ceases, in practical terms, to serve as an effective advocate for his or her client. *See United States v. Daniels*, 558 F.2d 122, 127–28 (2d Cir. 1977); *United States v. Burkley*, 511 F.2d 47, 50–51 (4th Cir. 1975); *cf. Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967).

The requirement that an attorney show "complete fidelity" to his or her client is distinct from the requirement that the attorney demonstrate some given level of competence.[5] The most salient operational difference between claims based on the two requirements relates to the issue of prejudice. Almost three years ago, in *Decoster III, supra*, this court imposed on defendants making a constitutional claim based on the *incompetence* of counsel "the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome" of the proceeding.[6] We have imposed no such requirement, however, on defendants making a claim grounded on a basic defect in the relationship between lawyer and client. Indeed, with regard to conflicts of interest,

both this court and the Supreme Court have, since *Decoster III*, reaffirmed the long-standing rule that a showing of prejudice is unnecessary.[7] I will attempt to demonstrate below why the same rule applies with regard to disabling irreconcilable differences, but it is clear, at the very least, that the question cannot be resolved by simple reference to the holding of *Decoster III*.

In this case, I believe that the record before us strongly suggests both a conflict of interest and disabling irreconcilable differences between Green and his counsel. Because no further showing of prejudice would be necessary to make out a successful Sixth Amendment claim on either of these grounds, I would remand these claims for an evidentiary hearing.

### A. Conflict of Interest

By the time of James Green's sentencing hearing, he was seriously displeased with the performance of his counsel, and had indeed "repudiated" counsel.[8] In fact, Green told his probation officer that "he felt his lawyer was incompetent and that, perhaps there was a conspiracy between his lawyer and the Assistant U. S. Attorney."[9] Of course, a client's unhappiness with his lawyer does not in and of itself give rise to a violation of the Sixth Amendment.[10] In Green's case, however, that displeasure led

4. *See also United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *United States v. Burkley*, 511 F.2d 47, 51 (4th Cir. 1975).

5. *See United States v. Barnes*, 662 F.2d 777, 782 n.8 (D.C.Cir.1980); *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *United States v. Decoster*, 624 F.2d 196, 234–37 (D.C.Cir.1979) (MacKinnon, J., concurring), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979).

6. 624 F.2d at 208 (plurality opinion). The *Decoster III* formulation actually referred only to the "outcome of the *trial.*" *Id.* (emphasis added). I discuss at pp. 204–205 *infra,* the differences between the trial and sentencing contexts that must be kept in mind in giving content to *Decoster III*'s likely prejudice requirement.

7. *See Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1718–1719, 64 L.Ed.2d 333 (1980); *United States v. Barnes*, 662 F.2d 777, 782 n.8 (D.C.Cir.1980).

8. Transcript of Sentencing Hearing at 1, *quoted in* Maj. op. at 184–185. *See* Presentencing Report at 3; Affidavit of Trial Counsel at 1–2.

9. Presentencing Report at 3.

10. *But cf. Slappy v. Morris*, 649 F.2d 718, 720–21 (9th Cir. 1981); *United States v. Barnes*, 662 F.2d 777, 781 (D.C.Cir.1980); *United States v. Mardian*, 546 F.2d 973, 979–81 (D.C.Cir.1976); *United States v. Seale*, 461 F.2d 345, 356–61 (7th Cir. 1972); *Brown v. Craven*, 424 F.2d 1166, 1169–70 (9th Cir. 1970) (all discussing parameters of defendant's right to counsel of his choice).

to more than the usual reaction on the part of counsel, and that reaction gives every sign of having created precisely the sort of "actual conflict of interest adversely affect[ing] his lawyer's performance" which *is* in and of itself a violation of the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980);[11] *see United States v. Barnes*, 662 F.2d 777, 781–82 (D.C.Cir.1980); *United States v. Hurt*, 543 F.2d 162 (D.C.Cir.1976).

Green alleges that his counsel did not discuss his presentence report with him, or disclose its contents.[12] His explanation for this alleged failure is that counsel was concerned about the presentence report's account of Green's dissatisfaction with counsel.[13] Neither the claim nor Green's explanation is inconcrete, conclusory, or incredible,[14] and only an evidentiary hearing can determine what actually happened and why. But if Green's allegations are well-founded, then it seems clear to me that counsel's "concern for [her]self"—rather than mere negligence, indifference, or bad judgment—led counsel to take a course of action contrary to that called for by her "duty to [her] client."[15]

Even if Green's counsel did show him the presentencing report, the contents of that report create a further reason to infer the existence of an actual conflict of interest. The report's "Evaluative Summary" included a statement that, "[i]n our view, [Green] rather clearly projected responsibility onto others, particularly the police, the Assistant U. S. Attorney, and even his own lawyer."[16] An effective presentation at Green's sentencing hearing could easily have included an argument that Green in fact had a more mature personality than he was given credit for in the presentence report. In support of that argument, Green's advocate could easily have been required to argue that some or all of Green's complaints about his trial counsel were in fact supportable, and not merely the product of a tendency to project responsibility. Because our cases make very clear that it is unreasonable to "expect an attorney to vigorously attack his own prior representation of a client," *United States v. Barnes, supra*, at 782, I would remand for an evidentiary hearing to determine whether the contents of the presentencing report did in fact create an actual conflict of interest between Green and his counsel.

Finally, even if we ignore any of the problems created by the presentencing report, the transcript of the sentencing hearing creates a clear inference that an actual conflict of interest adversely affected counsel's performance. At the very start of Green's sentencing hearing, his counsel announced that "I am almost in a position where I feel I need counsel."[17] Counsel then went on to devote half of an already abbreviated allocution to a self-serving defense of counsel's conduct at trial, saying that "I am sure the Court remembers the trial for we went through it for several days and in at least this counsel's opinion

---

11. *Cuyler* seems to require both that the conflict of interest between lawyer and client be "actual" rather than "potential," and that it "adversely affect" counsel's performance, but these are in fact not necessarily separate issues: as a number of courts have recognized, any otherwise "potential" conflict that "adversely affect[s] ... counsel's performance" is by definition an "actual conflict." *See Brown v. United States*, 665 F.2d 271, 272 (9th Cir. 1982); *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *Honneus v. United States*, 509 F.Supp. 1135, 1138–39 & n.3 (D.Mass.1981).

12. Appellant's Motion at p. "1–B" of Attachment.

13. *Id.*

14. *See Machibroda v. United States*, 368 U.S. 487, 493–96, 82 S.Ct. 510, 513–15, 7 L.Ed.2d 473 (1962); *Walker v. Johnston*, 312 U.S. 275, 285, 61 S.Ct. 574, 578, 85 L.Ed. 830 (1941); *Friedman v. United States*, 588 F.2d 1010, 1014–17 (5th Cir. 1979); *Lindhorst v. United States*, 585 F.2d 361, 364–66 (8th Cir. 1978); *Stidham v. Wingo*, 452 F.2d 837, 839–40 (6th Cir. 1971).

15. *See United States v. Hurt*, 543 F.2d 162, 166 (D.C.Cir.1976); *cf.* Maj. op. at 190–191 n.12.

16. Presentencing Report at 6.

17. Transcript of Sentencing Hearing at 1.

tried as best we could to give him full and fair representation." [18] Whether in response to the allegations Green made to his probation officer, or in response to counsel's own report of Green's "repudiation," or in anticipation of charges Green could have made at the sentencing hearing or did make in a subsequent *pro se* motion for new trial,[19] it seems that counsel felt the need to make clear that Green had no legitimate grounds for complaint. Such an attempt to retain the general confidence of the trial court judge and the rest of the community, even at the expense of the client being immediately represented, would have been entirely natural. But it would also have been contrary to Green's constitutional right to "the services of an attorney devoted solely to the interests of his client," *Von Moltke v. Gillies*, 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948), *quoted in United States v. Hurt, supra*, at 165–66.

In light of all of the above, I am convinced that the record demonstrates the strong possibility that the self-serving instincts of Green's counsel "adversely affected ... counsel's performance." [20] I would therefore remand for an evidentiary hearing in which the precise facts and their precise consequences can be more conclusively determined.

### B. *Disabling Irreconcilable Differences*

#### 1. *Basis of the Claim*

The Constitution requires that counsel in a criminal case act "in the role of an active advocate in behalf of his client, [rather than] that of *amicus curiae.*" *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967), *cited in United States v. Hurt*, 543 F.2d 162, 168 n.31 (D.C. Cir.1976). In this case, the record strongly suggests the possibility that the rift be-

tween Green and his counsel not only triggered a conflict of interest between them, but also more generally rendered counsel unable or unwilling to give Green the zealous advocacy and "complete fidelity" to which he was entitled. *Cf. Brown v. Craven*, 424 F.2d 1166, 1169–70 (9th Cir. 1970). Indeed, it strongly appears that Green was, in practical terms, *left unrepresented at his sentencing hearing. See United States v. Daniels*, 558 F.2d 122, 127 (2d Cir. 1977); *United States v. Burkley*, 511 F.2d 47, 51 (4th Cir. 1975).

As I have previously discussed, Green's counsel began the sentencing hearing with the comment that she almost felt as if she needed counsel. She then proceeded to inform the district court that "this defendant, I think I should say for the record, has totally repudiated this humble counsel." [21] The most charitable reading I can give this otherwise gratuitous and counterproductive remark is that counsel was attempting, if awkwardly, to inform the court, "for the record," that the rift between Green and counsel made it impossible for counsel to provide Green with effective representation. This message becomes much more explicit in counsel's next words: "I say this defendant has totally repudiated this humble counsel *and so all I can say is that* this is a young man. He is in military service. I think there must be within him seeds for rehabilitation." [22] The language I have italicized strongly suggests that counsel recognized that an adequate allocution would have required more than a few half-hearted and ambiguous comments on Green's behalf, but felt unable or unwilling, because of the rift that had developed between them, to go beyond those words. The exact nature of the causal relationship may not be certain: perhaps a failure of communication between lawyer and client, or perhaps

---

**18.** *Id.*

**19.** The *pro se* motion was made during the course of Green's original appeal, and after the appointment of appellate counsel. The motion claimed ineffective assistance of counsel in counsel's alleged failure to file certain *pretrial* motions. It was denied without opinion on May 20, 1969.

**20.** *See* n.11 *supra.*

**21.** Transcript of Sentencing Hearing at 1.

**22.** *Id.* (emphasis added).

sheer exasperation or distraction on counsel's part. But, in light of counsel's clear statement of her inability to represent Green adequately, as confirmed by the actual content of her allocution, it is an open question to me whether the mere presence of counsel at Green's sentencing hearing provided him, in any meaningful sense, with the level of active representation guaranteed by the Sixth Amendment. *See Anders v. California, supra; United States v. Daniels, supra; Brown v. Craven, supra.*

## 2. The Prejudice Standard

The one serious issue remaining as to this part of Green's claim is whether he must also show some form of prejudice in order to prevail. I believe, however, that the same considerations that have led courts not to apply a prejudice test in cases of conflict of interest also require us to reject such a test in the context of disabling irreconcilable differences.

I should note at the outset that, if one were to rely entirely on the majority opinion, it would not be at all clear why even conflict of interest claims do not require a showing of prejudice. The majority suggests that the main consideration prompting the imposition in *United States v. Decoster*, 624 F.2d 196 (D.C.Cir.) (plurality opinion), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979) (*Decoster III*), of a "likely prejudice" standard on claims of ineffective assistance based on attorney incompetence was the absence in such cases of the sort of explicit government action found in, for example, outright government interference in the ability of counsel to represent his or her client.[23] If the precise role of the official agencies of government were the only touchstone in deciding whether or not to impose a prejudice test, however, far too much would be swept away along with claims of incompetence. The very illustrations used in *Decoster III* indicate that this was not the court's intention.[24] Although I dissented in *Decoster III*, I would certainly give the plurality opinion in that case more credit than the majority's construction would suggest. Moreover, to the extent that *Decoster III* did rely on the "state action" rationale to explain the imposition of different prejudice standards for different types of Sixth Amendment claims, that reasoning has been seriously undercut by *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980), in which the Supreme Court explicitly defined a class of Sixth Amendment cases in which (1) there is *no* government involvement of the sort contemplated by *Decoster III*, but in which (2) a resulting conviction should be overturned *without* a showing of prejudice.

In fact, a sensitive reading of *Decoster III* suggests a number of criteria, besides the degree of explicit state involvement, that must be applied in determining whether a prejudice test is appropriate in a particular Sixth Amendment context. One of these is whether the particular problem being addressed is "susceptible to easy correction by prophylactic rules."[25] Disabling irreconcilable differences, like conflicts of interest, can be fairly objectively identified by participants in the trial process. In particular, although it may be difficult to expect defense counsel to doubt his or her own competence, it is neither unreasonable nor unrealistic to expect defense counsel to identify situations in which they become unable to give their client zealous and single-minded representation.[26] Imposing a prophylactic rule at the review stage is therefore, in both cases, workable and salutory.

A second criterion identified in *Decoster III* is the need to find a legal standard that pragmatically "achieves a realistic solution of the pertinent legal tensions."[27] One of those tensions arises out of the disruptive effects that too strict a standard in incompetence inquires would have on the criminal justice system.[28] I continue to believe that such disruption may be a lesser price to pay than continuing to tolerate a system that provides grossly unequal justice to those unable to afford competent counsel.[29] But, be that as it may, neither conflicts of interest nor irreconcilable differences so pervade

---

23. Maj. op. at 188–189.

24. 624 F.2d at 201–02 (plurality opinion); *cf. id.* at 235–36 (MacKinnon, J., concurring).

25. *Id.* at 201 (plurality opinion).

26. *Cf. Anders v. California*, 386 U.S. 738, 744–45, 87 S.Ct. 1396, 1400–01, 18 L.Ed.2d 493 (1967); ABA Code of Professional Responsibility, DR 5–101(A).

27. 624 F.2d at 208 (plurality opinion).

28. *Id.* at 214–17.

29. *Id.* at 295–300 (Bazelon, J., dissenting).

relationships between criminal defendants and their counsel that we need fear that an effective and stern check on those problems would lead to "noxious consequences."[30]

The second "pertinent legal tension" that concerned the *Decoster III* plurality was the view that too probing an inquiry into attorney incompetence would intrude excessively into the lawyer-client relationship and ultimately threaten the adversary model of justice to which we are committed.[31] Clearly, this same concern cannot be relevant when what is at stake are not particular judgments made by defense counsel during the course of representing a client, but a breach in the attorney-client relationship itself. Indeed, rigorous enforcement of the Sixth Amendment guarantee against representation by a lawyer with whom one has either a conflict of interest or a disabling irreconcilable difference can do nothing but strengthen the adversary system of justice.

A final consideration, only implicit in the *Decoster III* plurality opinion, but emphasized in the concurrence by Judge MacKinnon,[32] and of prime importance in other cases concerning the issue of whether or not to impose a prejudice requirement [33] is the balance, in any particular category of Sixth Amendment protections, between the overall likelihood of prejudice and the difficulty of proving prejudice in a particular case. With regard to conflicts of interest, the Supreme Court said in *Holloway v. Arkansas*, 435 U.S. 475, 490–91, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978), that the evil "is in what the advocate finds himself compelled to *refrain* from doing" rather than in any particular affirmative act and that an inquiry into prejudice would therefore require "unguided speculation." Clearly, precisely the same problem applies with regard to disabling irreconcilable differences.

Taking into account all these considerations, I conclude that Green's claim that the rift between him and his lawyer deprived him of a zealous and active advocate does not require any additional showing of prejudice. Therefore, we need not look beyond the content of counsel's remarks at the sentencing hearing to remand for an evidentiary hearing before the district court.

## C. *The Majority's Position*

The majority advances two main arguments against my analysis of the conflict of interest and disabling irreconcilable difference issues in this case. First, it suggests that I have defined one or both of these concepts too broadly. Second, it claims that I have advanced no causal link between the nature of Green's relationship with his counsel and the performance of counsel.

With regard to the first point, I believe that my analysis of both the conflict of interest and disabling irreconcilable differences issues goes no further than is required by the common sense meaning of the constitutional requirement that counsel be "able and willing to advocate fearlessly and effectively," with "complete fidelity" to the interests of his or her client.[34] Moreover, the majority's attempt to restrict the scope of this vital constitutional guarantee is clearly refuted by the very case-law cited by the majority. In *United States v. Hurt*, 543 F.2d 162 (D.C.Cir.1976), for example, the attorney who represented Hurt during an evidentiary hearing examining ineffective assistance by defendant's original trial counsel found himself sued for libel by the lawyer whose performance he was challenging. The court found that, although the doctrine of absolute immunity gave counsel at the evidentiary hearing "little or nothing to fear from continued representation of appellant on the evidentiary inquiry into the quality of the service which trial counsel had rendered," *id.* at 167, counsel's exaggerated and almost entirely subjective concern about the consequences of the suit created a conflict of interest between him and his client.

*United States v. Barnes*, 662 F.2d 777 (D.C.Cir.1980), is perhaps even more directly on point. As relevant here, that case involved the representation of a defendant in a 2255 hearing by his original appellate counsel. Among a number of questions possibly at issue in the hearing was whether the defendant's substantive claim was barred by his failure to raise it on the original appeal. Counsel at the 2255 hearing both neglected to discuss that issue and

---

**30.** *See id.* at 217 (plurality opinion).

**31.** *Id.* at 208–09.

**32.** *Id.* at 236–37 (MacKinnon, J., concurring).

**33.** *See e.g. Holloway v. Arkansas*, 435 U.S. 475, 487–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426

(1978); *Cooper v. Fitzharris*, 586 F.2d 1325, 1332 (9th Cir. 1978), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979); *United States v. Hurt*, 543 F.2d 162, 168 (D.C.Cir. 1976).

**34.** *See* pp. 192–193 *supra*.

was generally defensive about his prior representation of the defendant. This court easily perceived a conflict of interest. I find it difficult to understand how, in light of both *Barnes* and *Hurt,* the majority here can argue that the record conclusively demonstrates that there was no conflict of interest between Green and his counsel.

The majority also writes that my analysis does no more than "restat[e] counsel's alleged deficiencies and [then] by fiat ascrib[e] Green's expressed unhappiness with counsel as their cause." [35] I must of course, respectfully disagree. If Green is telling the truth when he alleges that counsel did not show him the presentence report—something the majority concedes cannot be decided by this court on this record—then the possibility that the failure was caused by the report's account of Green's dissatisfaction is concrete and plausible. Similarly, I see nothing far-fetched about the possibility that counsel's self-serving comments at the sentencing hearing were the product of defensiveness rather than some more mysterious cause. And we need look no further than counsel's own words at the sentencing hearing—"this defendant has totally repudiated this humble counsel and so all I can say is that . . ." etc.[36]—in order to conclude that her abbreviated allocution was probably due to her irreconcilable differences with Green. I do not pretend that we can know all these things with certainty. But it is precisely the purpose of an evidentiary hearing to sort out all the facts and reach a more definite conclusion. Because I see nothing in this record that *conclusively*

demonstrates that Green's claim is without merit, I believe he is entitled to that opportunity.[37]

## II.  THE DUTY OF THE SENTENCING JUDGE

Aside from requiring that counsel show "complete fidelity" to their clients, the Sixth Amendment also imposes a separate qualified duty on trial judges to guarantee that such complete fidelity does in fact exist.[38] The majority holds that "[t]he absence of a cognizable conflict also disposes of appellant's contention that the sentencing judge ought to have inquired into the nature of the 'problem' between Green and his counsel." [39] This holding assumes that whether or not there was any duty on the part of the sentencing judge follows automatically from whether or not the performance of counsel, in and of itself, led to a constitutional deprivation. As the Supreme Court made clear in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), however, the two issues are governed by entirely different standards. In the absence of a duty of inquiry, a violation of the Sixth Amendment will not be found unless there was an *actual* conflict of interest. *Id.* at 348, 100 S.Ct. at 1718. The duty of inquiry, on the other hand, is triggered by the combination of (1) a *possible* conflict of interest, and (2) either "timely objection" or "special circumstances" sufficient to reverse the normal presumption that either no conflict in fact exists or the lawyers and clients involved knowingly accept such risk of conflict as may exist. *Id.* at 346–48, 100 S.Ct. at 1717–18.[40]

---

**35.** Maj. op. at 190–191 n.12.

**36.** *See* p. 187 *supra.*

**37.** The majority makes much of the fact that the record before the district court was supplemented by an affidavit from Green's original counsel. Maj. op. at 186. By my reading of the affidavit, however, it does not add any information that would reduce the need for an evidentiary hearing. The affidavit does state, contrary to Green's sworn 2255 motion, that counsel showed the presentencing report to Green and discussed it with him. *See* p. 201 & n.48 *infra.* But this account does no more than create a direct conflict between two credible and concrete sworn statements, and such a conflict can only be resolved by an evidentiary hearing in which both claims can be subject to thorough cross-examination. *See Walker v. Johnston,* 312 U.S. 275, 286–87, 61 S.Ct. 574, 579, 85 L.Ed. 830 (1941); *Lindhorst v. United States,* 585 F.2d 361, 364–65 (8th Cir. 1978);

Advisory Committee Note to Rule 7 of the Rules Governing § 2254 Cases (quoting *Raines v. United States,* 423 F.2d 526, 530 (4th Cir. 1970)). (The Advisory Committee Note to Rule 7 of the Rules Governing § 2255 Proceedings refers to the corresponding § 2254 Advisory Note as the source for "a full discussion of reasons and procedures for expanding the record.") Perhaps more important, counsel's own account of the upshot of her alleged conversations with Green can only add weight to the conclusion that she provided him with ineffective assistance. *See* p. 201 *infra.*

**38.** *See Holloway v. Arkansas,* 435 U.S. 475, 481–87, 98 S.Ct. 1173, 1177–1180, 55 L.Ed.2d 426 (1978); *cf. United States v. Williams,* 594 F.2d 1258 (9th Cir. 1979); *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir. 1970).

**39.** Maj. op. at 190–191 n.12.

**40.** The majority reads *Cuyler* to impose a duty of inquiry only in cases of actual conflict. Maj.

The majority must concede that there was at least a possible conflict of interest in this case. Whether or not counsel's statements at Green's sentencing hearing—such as "I am almost in a position where I feel I need counsel" and "this defendant has totally repudiated this humble counsel"—constituted a "timely objection," they almost certainly created the "special circumstances" that should have led the sentencing judge to insure that Green was receiving adequate representation. Indeed, the Court relied on far more tenuous grounds to impose a duty of inquiry under the *Cuyler* standard in the subsequent case of *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Moreover, this case, unlike *Cuyler* and *Wood*, involves a conflict of interest between lawyer and client rather than counsel's conflicting loyalties to various clients or employers. Consequently, even the presumption invoked in *Cuyler* that possible conflict will, absent some signal to the contrary, be outweighed by possible benefits, may not apply. In any case, it seems clear to me that even if my analysis in Part I of this dissent is mistaken, the judge presiding at Green's sentencing hearing probably had an affirmative duty to inquire into the import of the words spoken by counsel, and to take whatever steps would have been necessary to protect Green's rights under the Sixth Amendment.[41]

In light of the sentencing judge's almost certain duty of inquiry, it is particularly disturbing that she not only failed to undertake an affirmative inquiry, but may have stifled whatever further opportunity there was for the issue to surface during the course of the hearing. At the conclusion of counsel's unhelpful and self-serving allocution, counsel "ask[ed] the Court to hear [Green] say anything he desires to say,"[42] at which point the following exchange took place between Green and the sentencing judge:

> THE COURT: Mr. Green.
> THE DEFENDANT: Your Honor, I would like to ask the Court a couple of questions, if I may.
> THE COURT: You just tell us what you have to say. The Court isn't interrogated.
> THE DEFENDANT: I have nothing to say.[43]

Whether or not such a response by the sentencing judge would, in the course of a normal sentencing hearing, represent a denial of the defendant's right to speak,[44] it may have, in this case, extinguished what hope there was of a complete inquiry into Green's relationship with his counsel, and the effect of that relationship on Green's rights under the Sixth Amendment.

### III. THE COMPETENCE OF COUNSEL

Even if the majority were correct that the only Sixth Amendment issue worth exploring in this appeal is the claim that Green was deprived of effective assistance of counsel by virtue of counsel's incompetence, I would still have to dissent from its conclusion that Green is not entitled to an evidentiary hearing on his claim.

#### A. *"Serious Incompetency"*

*United States v. Decoster*, 624 F.2d 196, 208 (D.C.Cir.) (plurality opinion), *cert. de-*

op. at 190–191 n.12. This reading is based on the Supreme Court's comment that "[u]nless the trial court knows or reasonably should know that a particular conflict exists, [it] need not initiate an inquiry." 446 U.S. at 347, 100 S.Ct. at 1717. When considered in context, however, the term "particular conflict" in that sentence seems most likely to refer to a possible conflict brought to the court's attention by objection or special circumstances rather than to an actual conflict. In any case, whatever ambiguity may exist in *Cuyler* is entirely erased by *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981), in which the Court found it "difficult . . . to determine whether an actual conflict of interest was present," but nevertheless held that "the *possibility* of a conflict of interest was sufficiently apparent at the time of the revocation hearing [in the court below] to impose upon the court a duty to inquire further" (emphasis in original).

41. My one hesitation arises out of the possibility that, in the context of the relationship between counsel and the sentencing judge, the words counsel spoke had a very different meaning than that which would otherwise be obvious from the record. But this hesitation, at best, requires that we remand for an evidentiary hearing, and would not justify our rejection of Green's claim.

42. Transcript of Sentencing Hearing at 1.

43. *Id.* at 2.

44. *See Green v. United States*, 365 U.S. 301, 305, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) ("Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing.").

*nied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979) (*Decoster III*), requires that, in any claim of ineffective assistance of counsel grounded on the alleged incompetence of counsel, "[t]he claimed inadequacy must be a serious incompetency that falls measurably below the performance ordinarily expected of fallible lawyers." As this court subsequently explained,

> this standard does not require "errorless representation," [but] it does demand that counsel's choices be "the product of deliberate and informed decision, not oversight or inadvertence." Where counsel's choices are uninformed because of inadequate preparation, or are not "arguably . . . the product of tactical decisions," a defendant has been denied his right to the effective assistance of counsel guaranteed by the Constitution.

*United States v. Hinton,* 631 F.2d 769, 780 (D.C.Cir.1980) (footnotes omitted). The majority explicitly declines to reach this part of the *Decoster III* test, focusing instead on the additional requirement in *Decoster III* that the accused bear the initial burden of "demonstrating a likelihood that counsel's inadequacy affected the outcome" of the proceeding.[45] I am convinced, however, that if the majority *had* reached the first prong of the *Decoster III* test, neither it—nor any honest observer—could have concluded that the record so far assembled in this case conclusively demonstrates that Green's counsel met the standard of competence demanded by the Constitution.

First, it is clear to me that, if we take as true Green's allegation that his counsel did not disclose the presentence report to him or disclose its contents, that failure by counsel would clearly constitute serious incompetence. *United States v. Donn,* 661 F.2d 820, 824 (9th Cir. 1981). "[A] defense attorney develops his case in large part from information supplied by his client." *Decoster III, supra,* at 209. Discussing the presentence report with Green would have been the best way for counsel to alert herself to inaccuracies or omissions in the report. A whole range of further decisions, including what investigations were appropriate and what arguments would have been viable at the hearing, would have depended on a thorough dialogue between lawyer and client. *See United States v. Pinkney,* 551 F.2d 1241, 1250–51 (D.C.Cir. 1976). Failure to confer with a client, and to attempt to obtain as much first-hand information from the client as possible, is not a "quick judgment,"[46] or a "tactical decision,"[47] which a court should be loath to second-guess, but is rather precisely the sort of egregious violation of a clear responsibility to which *Hinton* was addressed.

The second disturbing element in the record is counsel's failure, according to her own affidavit, to make an independent effort to verify the presentence report or fill in its gaps, even after Green allegedly expressed his objections to it.[48] Competent counsel is generally expected to verify the information contained in the presentence report, *see United States v. Pinkney, supra,* at 1250, supplement the report when incomplete, and challenge it when inaccurate, *see id.; United States ex rel. Jackson v. Myers,* 374 F.2d 707, 710 (3d Cir. 1967). I strongly doubt that Green's counsel's failure to meet these duties can be rationalized, even under *Decoster III's* non-"categorical" approach, 624 F.2d at 208 (plurality opinion), as a result of reasonable tactical choices or acceptable allocations of resources.

Finally, counsel's behavior at the sentencing hearing speaks for itself. Counsel's allocution was perfunctory at best, and very possibly counterproductive. Even if counsel's self-serving comments about the rift with Green and about counsel's own performance at trial are not evidence that counsel lacked "complete fidelity" to Green's cause,[49] they seem to display a serious lack of care and competence.

### B. *Likely Prejudice*

As I have already suggested, the majority bases its rejection of Green's claim of incompetent assistance of counsel on a finding that Green has not made an adequate showing of likely effect on the outcome of

---

**45.** Maj. op. at 188–189. *Cf.* note 6 *supra.*

**46.** *See United States v. Decoster,* 624 F.2d 196, 208 (D.C.Cir.) (plurality opinion), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979).

**47.** *United States v. Butler,* 504 F.2d 220, 224 (D.C.Cir.1974).

**48.** *See* Affidavit of Trial Counsel at 1 (stating that counsel *had* reviewed the presentence report with Green, and that though Green was unhappy with the report, counsel found it "accurate in all material respects" and "consistent with counsel's impressions of Mr. Green and with the information he had given [counsel] about himself.").

**49.** *See* Part II *supra.*

the sentencing hearing. This finding seems primarily grounded on the majority's reading of the district court opinion—a reading that I find entirely mistaken. The majority also states that "Green has identified no additional facts that might have been raised by counsel to sway the [sentencing] judge toward leniency."[50] I believe that this additional ground is not only equally mistaken, but also shows a disturbing lack of appreciation for the nature of the sentencing process.

### 1. Reliance on the District Court Opinion

As the majority concedes, the district court never reached the second prong of the *Decoster III* test in discussing Green's Sixth Amendment claim.[51] Rather, the district court judge, who had also been the original sentencing judge, rested on the first prong, stating that "[t]his Court specifically remembers the competence and skill of the trial attorney at all stages of the case, including the sentencing."[52] Instead of remanding to the district court on the issue of likely prejudice,[53] however, the majority engages in an awkward exegesis in order to reach the conclusion that the district court "*effectively* ruled out the possibility of prejudice emanating from the alleged deficiencies in counsel's performance."[54]

In reaching its conclusion, the majority looks to the section of the district court opinion which dealt with Green's claim that his Fifth Amendment rights had been violated by the presence of errors in his presentence report. In that part of its opinion, the district court held that "[t]he alleged errors pointed to in the presentence report . . . were not material to the Court's determination of sentence."[55] In explaining this holding, the district court went on to state that she had "relied primarily on the facts of the crime and the trial testimony in making [her] sentencing decision."[56] This finding by the district court was both proper and plausible, and I concur in the majority's rejection of Green's Fifth Amendment claim.[57] But the majority takes the district court's statement out of context when it holds that the statement "precludes a finding of likely prejudice" with regard to Green's claim of ineffective assistance of counsel.[58] It is one thing to say that, given the materials before the district court at the time of sentencing, all of which it considered, it found the most compelling factor in determining the sentence to be the facts of the crime and the trial testimony. It is an entirely different matter, both in logic and experience, to say that, if *additional* information, insights, and arguments had been presented to the sentencing court, it could not have been moved to impose a different sentence. To infer one conclusion from the other is just plain wrong.

I find it difficult even to rationalize the majority's conclusion as a corner-cutting but plausible inference from the overall tone of the district court opinion. First, a more committed and informative allocution by counsel, based on adequate consultation with Green and proper independent investigation, might have led the sentencing judge to impose a different sentence even if it did not move the judge not to "rel[y] *primarily* on the facts of the crime and the trial testimony." Second, there is no indication that the district court confronted the possibility that Green's counsel could have, aside from correcting the errors in the presentence report, also given a significantly expanded and persuasive allocution.[59] For the majority to feel the need to reach out as it does is particularly difficult to understand when it has the option of remanding the case and letting the district court speak for itself.

There is a serious additional problem with the majority's reliance on the district court's opinion. The district court's analysis of whether or not the errors in the presentence report tainted the sentencing

---

**50.** Maj. op. at 189–190.

**51.** *See id.* at 186–187, 189–190.

**52.** Memorandum Opinion at 3.

**53.** *See United States v. Hinton*, 631 F.2d 769, 783 (D.C.Cir.1980) ("Rather than speculate as to the meaning of the district court's findings, we remand the record for clarification [on the issue of prejudice].").

**54.** Maj. op. at 189–190 (emphasis added), *see also id.* at 190 n.11 (district court's holding

"amounts to the same thing" as finding of no effect on outcome).

**55.** Memorandum Opinion at 2.

**56.** *Id.*

**57.** *See* note 3 *supra.*

**58.** Maj. op. at 190.

**59.** The district court's memorandum opinion never mentions the possibility that Green's counsel could have provided an expanded allocution.

decision seems to have been based on something very much like an "actual prejudice" test. Even if there were more of a factual link, therefore, between the effects of the errors in the presentence report and the effects of the incompetency of Green's counsel, the district court's opinion could not assure us that the latter did not constitute sufficient "likely prejudice" to meet the second prong of the *Decoster III* test.[60]

The plurality opinion in *Decoster III* clearly saw an important distinction between likely prejudice and actual prejudice. In explaining why the "likely prejudice" test was an "appropriate modification"[61] of the more stringent standard articulated in *Bruce v. United States*, 379 F.2d 113, 117 (D.C.Cir.1967), Judge Leventhal commented that "[o]verreaching concepts of justice tug on the court whenever it is seriously troubled by likelihood of injustice, even though there is no concrete establishment of injustice as a fact."[62] For this court to rely on the district court's finding of no actual prejudice to find that there was no likely prejudice is a betrayal of *Decoster III*'s explicit attempt to fashion a suitable compromise position that would "achieve[ ] a realistic resolution of the pertinent legal tensions."[63] As I will explain in some more detail below, this erosion of *Decoster III* is most regrettable because it occurs in the context of attorney incompetence during sentencing.

### 2. *"Additional Facts"*

The majority opinion also states that "Green had identified no additional facts that might have been raised to sway the judge toward leniency."[64] On the contrary, Green raises a whole series of material facts that might have influenced the sentencing judge. For example, Green's counsel could have emphasized Green's stable employment history, which was left at best ambiguous in the presentence report. Counsel could have presented to the judge evaluations by Green's former employers that could have influenced the district court in its assessment of whether Green had the potential to make a valuable contribution to society. Counsel could have discussed Green's active ambition to be a music promoter. Counsel could have given the sentencing judge a more complete account of Green's family background than was contained in the presentence report. At the minimum, counsel could have avoided devoting half of her allocution to a series of self-serving pronouncements. None of these possibilities constitutes a "smoking pistol." But the facts relevant to sentencing are almost never in the form of smoking pistols. Rather, sentencing is a highly discretionary process influenced by a wide range of considerations.[65] We do know, however, that the role of defense counsel in sentencing can be critically important and influential.[66] We also know that considera-

**60.** *Cf. United States v. Hinton*, 631 F.2d 769, 783 (D.C.Cir.1980) (remanding for clarification because although district court opinion "could be considered a ruling on 'likely prejudice,' ... [the district court did] not reveal what standard it relied upon in reaching its conclusion.").

**61.** 624 F.2d at 206.

**62.** *Id.*

**63.** *Id.* at 208.

**64.** Maj. op. at 189–190.

**65.** *See United States v. Grayson*, 438 U.S. 41, 48, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978) (sentencing judges have broad discretion; one partial way to guide that discretion is to give judges "as much information as reasonably practical concerning the defendant's 'character and propensities[,] ... his present purposes and tendencies,' and, indeed, 'every aspect of [his] life.' ") (citations omitted); *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) ("a trial judge in the federal judicial system generally has wide discretion in determining what sentence to impose, ... [and] may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."); 18 U.S.C. § 3577 (1976) ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); Tyler, *Some Guideposts for the Compleat Sentencer,* in JUSTICE IN SENTENCING 198, 203 (Orland & Tyler, eds. 1974) ("Notwithstanding occasional declarations of judges and lawyers to the contrary, humility and wisdom require that we constantly bear in mind that sentencing and correctional dispositions do not lend themselves to an exclusively legal approach and formulation. Another way of putting this point is to say that sentencers must be allowed discretion in order to comport with the notions of our society of just [treatment].").

**66.** *See Mempa v. Rhay*, 389 U.S. 128, 133–34, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967); *Carter v. Illinois*, 329 U.S. 173, 178, 67 S.Ct. 216, 220, 91 L.Ed. 172 (1946) ("It is a commonplace that no more difficult task confronts judges than the determination of punishment not fixed by stat-

tions like employment and family history do often play a significant role in the sentencing decision.[67] Perhaps more important, our system of sentencing is based in large part on the premise that such considerations play a legitimate and desirable part in the sentencing calculus.[68] For the majority to say that "Green has identified no additional facts that might have been raised to sway the judge toward leniency" ignores both reality and aspiration. The only way to determine whether a more complete and effective allocution would have made a difference *in this case* is to remand for explicit and complete factfinding by the district court.

ute. Even the most self-assured judge may well want to bring to his aid every consideration that counsel for the accused can appropriately urge."); *United States v. Pinkney*, 551 F.2d 1241, 1248–51 (D.C.Cir.1976); *Wolfs v. Britton*, 509 F.2d 304, 311 (8th Cir. 1975) (counsel "has a substantial and very important role to perform in raising mitigating factors ... to the court at sentencing") (quoting American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function 227 (App.Draft 1971)); Kuh, *Defense Counsel's Role in Sentencing*, 14 Crim.L.Bull. 433 (1978) ("As long as judges in criminal matters retain broad discretion in imposing sentences, defense counsel's role may, if intelligently performed, do much to minimize that sentence that the court may impose." (Footnote omitted.)). As was said in *Martin v. United States*, 182 F.2d 225, 227 (5th Cir.), *cert. denied*, 340 U.S. 892, 71 S.Ct. 200, 95 L.Ed. 647 (1950).

> The very nature of the proceeding at the time of imposition of sentence makes the presence of defendant's counsel at that time necessary if the constitutional requirement [of the assistance of counsel] is to be met. There is then a real need for counsel.... Then is the opportunity afforded for presentation to the Court of facts in extenuation of the offense, or in explanation of the defendant's conduct; to correct any errors or mistakes in reports of the defendant['s] past record; and, in short, to appeal to the equity of the Court in its administration and enforcement of penal laws. Any Judge with trial Court experience must acknowledge that such disclosures frequently result in mitigation, or even suspension, of penalty.

Moreover, counsel is the only participant in the sentencing process who can effectively attempt to check the abuses and distortions that arise out of the probation officer's control of information and the insular relationship of probation officer and trial judge. *See* Fennell & Hall, *Due Process of Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts*, 93 Harv.L.Rev. 1615, 1668–70 (1980). Indeed, "the sentencing stage is the time at which for many defendants the [attorney can perform his or her] most important service of the entire proceeding ...." American Bar Association Project on Minimal Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures § 5.3(e) (App.Draft 1968) [hereinafter referred to as Sentencing Standards]; *see id.* at § 5.3(f) & Comments a, h–n.

**67.** *See United States v. Alton Box Board Co.*, 1977–1 Trade Cas. ¶ 61,336, at 71,168 (N.D.Ill. 1977) (sentencing judge "gives in depth consideration to the defendant's version of the offense, his prior record, if any, *his family history, his marital history, his home and neighborhood*, his education, his religious background, *his special interests and leisure time activities*, his physical, mental, and emotional health, his military history, if any, *his employment record, his occupational record*, his credit record and financial condition including his net worth, and his needs and the needs of others who depend upon him." (emphasis added)); R. Dawson, Sentencing: The Decision as to Type, Length, and Conditions of Sentence 200 (1969) (study of trial judges in Michigan indicates that they "attempt to make the minimum sentence reflect the total circumstances of the case. One judge, asked what factors he took into account in fixing the minimum, replied: 'Such matters as the convict's criminal record, family situation, circumstances of the crime in question, etc., are always taken into account by the court in fixing the minimum.'"); Wilkens, Kress, Gottfredson, Caplin & Gelman, Sentencing Guidelines: Structuring Judicial Discretion 8 (1978) (sentencing judges view employment history as most important measure of defendant's social stability); Ringold, *A Judge's Personal Perspective on Criminal Sentencing*, 51 Wash.L.Rev. 631, 640 (1976) ("At the time of sentencing, with the defendant before me, ... I study [*inter alia*] his history and that of his family. I evaluate his education, his training and employment, the emotional and physical health of his family, and the nature of his prior conduct.").

**68.** *See Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949) ("A sentencing judge ... is not confined to the narrow issue of guilt.... Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.... [P]revalant modern philosophy of penology [requires] that the punishment should fit the offender and not merely the crime."); *United States v. Foss*, 501 F.2d 522, 527 (1st Cir. 1974) ("any kind of mechanical sentence that steadfastly ignores individual differences is to be avoided"); S.1630, 97th Cong., 1st Sess., tit. III, sec. 125,

### 3. The "Likely Prejudice" Test Applied to Sentencing

The majority opinion raises a more general concern about the application of the second prong of *Decoster III* to sentencing. The *Decoster III* test was conceived with the trial context most clearly in mind.[69] To be faithful to the intent of *Decoster III* therefore requires that we recognize that "likely prejudice" is a much more slippery notion when applied to the outcome of a sentencing hearing than when applied to the outcome of a trial. In the first place, as I suggest above, sentencing is a highly individuated determination, and there is no easy formula for determining the effect of any particular fact or insight on the outcome. Second, the determination of a sentence entails consideration of a wide range of highly graduated alternatives, as opposed to the essentially bipolar decisionmaking engaged in at trial: "Likely prejudice" in the outcome of a trial requires a significant enough change in the original factfinding balance to result in a likely tipping of the factfinding balance. In the sentencing context, by contrast, there is no "balance" to be tipped, and any material factor could have some effect, large or small, on where along a range of possible results the decisionmaker will alight.

Together, these two differences between the trial and sentencing context make likely prejudice in the latter case both more likely to occur and also much more difficult to pin down. The majority opinion, however, ignores this dilemma. Rather than requiring a searching examination and thorough discussion by the district court, it denies Green's claim on the basis of a factually and legally unrelated finding in the district court's memorandum. And rather than attempting to be sensitive to the subtleties of the sentencing calculus, it adopts a mechanistic view of sentencing that challenges the defendant to find that one special fact that would push a lever marked "leniency" in the sentencing judge's mind.[70]

What most disturbs me about the majority opinion is that, while it purports to follow *Decoster III*, it may, as a practical matter, deprive defendants of the level of protection against incompetent counsel at sentencing that *Decoster III* attempted to afford them during trial. Such a result would be particularly unfortunate because sentencing is the one area in which judicial scrutiny may be most necessary. It has often been said that sentencing is the most important stage in a criminal proceeding.[71] It is not only important for the individual defendant, but is the one part of the process of criminal adjudication that attempts to do some affirmative good, rather than merely react to past events.[72] At the same time, sentencing is the phase of the criminal process that defense counsel are most likely to shirk, under the entirely mistaken view that their active role in representing their clients

§ 994(d) (1981) (proposed revision of federal criminal code) (in establishing categories of defendants for purpose of sentencing guidelines, Sentencing Commission created under statute should take into account, to the extent relevant, matters including vocational skills, previous employment record, and family ties and responsibilities); Advisory Council of Judges of the National Council on Crime and Delinquency, Guides for Sentencing 38–39 (1957) ("The defendant whose parents, brothers, and sisters have respected society's demands of law and order, whose family life demonstrates mutual love and consideration, whose parents have given him reasonable and consistent discipline, and whose family members are eager to help him, is a better probation risk than one who does not have these advantages.... A history of stable, steady employment, with job changes made primarily for improvement, usually indicates good social adjustment.").

**69.** 624 F.2d at 199, 208 (plurality opinion).

**70.** The majority opinion quotes at length from the district court's account of the facts of Green's crime. Maj. op. at 184. I do not know if it means to suggest thereby that Green's claim deserves a less careful hearing from this court than if his crime had not been so repugnant. If that is indeed the majority's attitude, it would be most unfortunate. Whether or not we believe that James K. Green deserves any measure of our solicitude, we at least owe ourselves a duty to insure that nothing in the process by which he was sentenced compromised *society's* interests in criminal dispositions that are accurate and, at least potentially, productive.

**71.** *See United States v. Pinkney*, 551 F.2d 1241, 1249 (D.C.Cir.1976); Sentencing Standards, *supra* note 66, at § 5.3, Comment k; A. Campbell, Law of Sentencing § 102, at 330 (1978); M. Frankel, Criminal Sentences at vii (1972); Nemerson, *Coercive Sentencing*, 64 Minn.L. Rev. 669, 740 (1980).

**72.** The individualized sentence is an attempt to balance the needs of society and the needs of the defendant so as to improve as much as possible the fate of each. Moreover, the pronouncement of a criminal sentence, properly conceived,

ends with a verdict or plea of guilty.[73] The majority opinion will do precious little to alert attorneys to the importance of their role at sentencing. It may, in fact, demote allocution to a superfluity and signal the abandonment of any serious effort to ensure that sentencing be more than a meaningless charade unworthy of our aspirations and contrary to the practical needs of the criminal justice system.

### On Petition for Rehearing

Before BAZELON, Senior Circuit Judge, WILKEY and WALD, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of appellant's petition for rehearing, filed June 21, 1982, it is

ORDERED by the Court that the aforesaid petition is denied.

### On Suggestion for Rehearing En Banc

Before ROBINSON, Chief Judge, BAZELON, Senior Circuit Judge, WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG and BORK, Circuit Judges.

### ORDER

PER CURIAM.

Appellant's suggestion for rehearing en banc has been circulated to the full Court and the Court not having voted in favor thereof, it is

ORDERED by the Court en banc that the aforesaid suggestion is denied.

A statement of Senior Circuit Judge Bazelon concerning his call for a vote on the suggestion for rehearing en banc is attached.

Statement of Senior Circuit Judge BAZELON as to why he called for a vote on rehearing en banc.

This case has no bearing whatsoever on the question of James K. Green's guilt or innocence. It has nothing to do with being "soft" or "hard" on crime. There is no possibility of a new trial. Green's request for a hearing on his attorney's conduct at sentencing does, however, put the integrity of the entire sentencing process on the line. In rejecting his request, the court's per curiam opinion recurrently notes that he was convicted of a repugnant crime and that 11½ years passed before he filed the instant petition.[1] The court does not, as of course it cannot, explicitly rely on the stink of the crime or the passage of time.[2] I believe the arguments it does articulate are just as unsupportable. This decision is a dangerous precedent.

First, the court argues that no "likely prejudice" resulted from counsel's shoddy behavior.[3] However, under a clear and long-standing exception to the prejudice requirement, no such demonstration has ever been required where counsel's performance was adversely affected by a conflict of interest or other disabling differences.[4] The record amply shows that there was a serious conflict between Green and his counsel, and there can be little question that this conflict contributed to counsel's self-serving conduct at sentencing.[5]

Second, the court states that a trial judge's duty to inquire into the possibility of attorney conflict of interest arises only where there is an "actual" conflict.[6] In fact, the Supreme Court has stated quite clearly that the duty to inquire is triggered by (a) possible conflict of interest, and (b)

---

forces the participants in the criminal process to confront anew the moral and political complexities inherent in the criminal act. The social and psychological factors underlying street crime may have so transformed some defendants that little hope exists for their rehabilitation. The safety of society may indeed require them to be incapacitated, particularly if the only available alternative is to return them to the twisted world of their origins. Such defendants are doubly cursed. In these cases, however, the very unearthing of the social and psychological factors will at least direct society's attention toward the strong possibility that these same factors will also transform a defendant's children or younger brothers and sisters. Our sense of criminal justice thus sensitizes our sense of

social justice, and expands the criminal process into the political process.
Bazelon, *Missed Opportunities in Sentencing Reform*, 7 Hofstra L.Rev. 57, 61 (1978).

73. *See United States v. Pinkney*, 551 F.2d 1241, 1249 (D.C.Cir.1976); A. Campbell, *supra* note 71, at v, § 102 (Sentencing Standards, *supra* note 66, at § 5.3, Comment a.

1. See Maj. op. at 183, 184, 185, 188, 189, 190.

2. See dissenting op. at 205 n.70.

3. See Maj. op. at 188–191.

4. See dissenting op. at 184–190.

5. See id. at 184–186.

6. See Maj. op. at 191 n.12.

either "timely objection" or "special circumstances" that alert the judge to that possibility. Both factors were triggered here.[7]

Third, although the court concedes that the district court never reached the likely prejudice issue,[8] it inexplicably decides for itself that the district court's opinion "amounts to the same thing" as a finding of no likely effect on the outcome.[9] This rush to judgment flies squarely in the face of previous decisions by this court requiring a remand for a factual determination of the prejudice issue.[10] Contrary to the court, I believe this record reeks with doubt about the likely effects of counsel's performance.[11]

Fourth, the court's mechanical application of the likely prejudice standard shows little comprehension of or sensitivity to the unique and subtle complexities of the sentencing calculus.[12]

Finally, this decision seriously erodes our long-standing commitment to the proposition that defense counsel's investigation and allocution are pivotal to the sentencing process.[13] The reality is that all too many defendants are unable to afford counsel who are willing or able to carry out these duties effectively. The courts must respond when alarm bells go off indicating possible incompetence, conflict, or other impropriety. Today this court has turned a deaf ear to the alarm, however, and has sent a message to the bench and bar that we couldn't care less if defense counsel's contribution to the sentencing process is carried out competently, incompetently, or not at all.

---

**7.** See dissenting op. at 190–191. The circularity of this court's reasoning is striking: the only purpose of an inquiry is to determine whether a conflict actually existed, but because Green has not demonstrated that a conflict actually existed, no inquiry need be held. See Maj. op. at 191 n.12.

**8.** Maj. op. at 189. The district court did not reach the issue because it held that Green's counsel had performed competently at sentencing. If this court had not gone out of its way to avoid that issue, I believe it could not honestly have concluded that Green's counsel met the minimum standard of competency required by the Constitution. Green's counsel is alleged never to have shown him his presentence report. According to counsel's own version of the story, she failed to pursue any independent investigation into the facts relevant to sentenc-

ing, even after Green complained about the accuracy and tone of the sentencing report. And her behavior at sentencing was so self-serving and counter-productive that I doubt it could honestly be said that she presented any allocution at all or that Green had, in practical terms, any representation at all. See dissenting op. at 191–201.

**9.** Maj. op. at 190 n.11; see also id. at 189 (district court "effectively ruled out the possibility of prejudice") (emphasis added).

**10.** See dissenting op. at 202 n.53, 203 n.60; *United States v. Hinton,* 631 F.2d 769, 783 (D.C. Cir. 1980).

**11.** See dissenting op. at 203, 205.

