**UNITED STATES of America, Appellee,**

v.

**Ronald Michael TAVARES, Appellant.**

**Nos. 92–3095, 94–3022 and 95–3053.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1996.

Decided Nov. 26, 1996.

L. Barrett Boss, Assistant Federal Public Defender, argued the cause, for appellant. A.J. Kramer, Federal Public Defender, was on brief. Neil H. Jaffee, Assistant Federal Public Defender, Washington, DC, entered an appearance.

Anne E. Pings, Assistant United States Attorney, argued the cause, for appellee. Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on brief. Elizabeth Trosman, Assistant United States Attorney, Washington, DC, entered an appearance.

Before: SENTELLE, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Ronald Tavares appeals his conviction on one count of possessing lysergic acid diethylamide (LSD) with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and the district court's denial of his motion pursuant to 28 U.S.C. § 2255 to vacate his resulting sentence. He does not challenge his conviction on a second count involving a smaller amount of LSD. He argues that he received ineffective assistance of counsel in that his trial counsel failed to take the proper steps to preserve his right to testify in his own defense, which right he relinquished due to his poor health during the trial. The district court applied the analysis set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and concluded that Tavares was not prejudiced by his failure to testify. We affirm.

## I. FACTS

On June 12, 1991, in his Washington, D.C. apartment, Tavares sold 1,000 doses of LSD to William Denford (Denford), an undercover detective, for $1,000. Tavares and Denford subsequently agreed to a second transaction, in which Tavares was to give Denford cash and more LSD in exchange for marijuana, to take place the following week.

On June 21, Tavares and Denford met at a restaurant in Baltimore. During the course of their conversation, which was captured on audiotape, Tavares stated "I got plenty" of doses of LSD and "you get the lightning bolts and then there's more of the green ying-yangs [sic] .... green yangs just came in .... they laid a thousand at a time." Tavares's accomplice, Hans Howarth (Howarth), went outside with Denford and, at Tavares's direction, gave the detective $3,750 and 100 doses of LSD in exchange for 17 pounds of marijuana. Denford and his fellow agents promptly arrested Tavares and Howarth.

Denford and the other agents then returned to Washington to execute a search warrant for Tavares's apartment. They discovered 141 doses of LSD configured in a "bug design" in Tavares's bedroom and 8,440 doses in a yin-yang design hidden in a record album cover in the living room. Tavares was ultimately indicted by superseding indictment on one count of LSD distribution (for the June 12 sale) and one count of LSD possession with intent to distribute (for the LSD found in his apartment on June 21).[1]

Problems developed with his appointed counsel, Robert Werdig (Werdig), almost immediately. As a result of Werdig's failure to meet with him, Tavares asked for new counsel but withdrew that request after Werdig finally arranged a brief meeting. According to Tavares, he and Werdig agreed that he would testify but did not discuss his testimony. Werdig apparently attempted to build a selective prosecution defense but also put on some evidence of a straightforward exculpatory nature. For example, the only defense witness—Tavares's girlfriend, Denise Helou (Helou)—testified that she had never seen record albums or a record player in Tavares's apartment before and that Tavares's younger brother and another man, Joe Johnson (Johnson), had unrestricted access to the apartment.

Before calling Helou, Werdig informed the court that Tavares "might wish to take the stand but that he could not do it today, that his state of physical well-being is not such that he feels strong enough to commence his

---

1. He was tried in Maryland state court for the June 21 sale, was convicted and received a five- year suspended sentence.

testimony at this time."[2] App. 73. The court recessed for the day after Helou's testimony. Tavares's health grew worse overnight and by morning he felt physically unable to testify. Before court reconvened that morning, Werdig advised Tavares not to testify but did not advise him that he could seek a continuance until his health improved. Tavares agreed.

Werdig then informed the court that Tavares had decided not to testify and rested his case. Tavares was convicted on both counts. Tavares's health continued to decline, requiring him to go to the hospital two days later. He suffered from a variety of symptoms and was diagnosed with an inflammation, and possible abscess, of his hip muscles. His doctor stated in an affidavit that in his opinion Tavares "would not have been well enough to focus and participate effectively" in his trial. App. 236.

## II. DISCUSSION

Tavares argues that his counsel's failure to take appropriate measures in light of his health problems effectively deprived him of his right to testify. As the district court correctly noted, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), provides the appropriate framework for assessing such a claim. *See, e.g., Payne v. United States,* 78 F.3d 343, 345–46 (8th Cir.1996); *Lema v. United States,* 987 F.2d 48, 51 (1st Cir.1993); *Nichols v. Butler,* 953 F.2d 1550, 1552 (11th Cir.1992).

Applying *Strickland*'s two-part analysis, Tavares argues that his trial counsel's performance fell below an objectively reasonable standard and there is a reasonable probability that the outcome of his trial would have been different absent the deficiency. *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2066–67. With regard to his counsel's performance, Tavares points to Werdig's initial failure to arrange a meeting, Werdig's failure to discuss Tavares's testimony when they finally did meet and the brevity (15 minutes) of that meeting. He emphasizes Werdig's failure to seek a continuance or take other appropriate action when it should have been obvious that Tavares was physically unable to testify as well as Werdig's flawed advice regarding the scope and impact of his cross-examination.[3] Although it does not expressly concede that Werdig's performance was inadequate, the government does not contest Tavares's arguments on this point.[4] The only question before us thus is whether Tavares was prejudiced by his counsel's actions—specifically by Werdig's failure to ensure that Tavares had an opportunity to testify.

Although not speaking in the context of an ineffective assistance of counsel claim, the Supreme Court has repeatedly emphasized the importance of the defendant's testimony in his own defense. *See, e.g., Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987) ("the most important witness for the defense in many criminal cases is the defendant himself"); *Ferguson v. Georgia,* 365 U.S. 570, 582, 81 S.Ct. 756, 763, 5 L.Ed.2d 783 (1961) (defendant "above all others may be in a position to meet the prosecution's case."); *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) ("The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."). The de-

**2.** The district court had noticed that Tavares had been walking with a limp and asked "Is your leg all right? Can I do anything with respect to that?" App. 37. Tavares answered, "I have some problems with my bladder. I have a kidney infection and I have intestinal matters. It's not really much that I can do besides maybe get a decent meal. I haven't had a decent meal in four months." App. 37.

**3.** According to Tavares, on the first day of the trial Werdig advised Tavares not to testify "because he did not feel that [Tavares] could handle cross-examination and [Tavares's] testimony could weaken his vindictive prosecution defense and jeopardize [Tavares's] appeal." App. 229. Tavares states that on the final morning of the trial Werdig again advised him not to testify "given [his] health and the additional time that the prosecutor had had (i.e., overnight) to prepare to cross-examine me." App. 231.

**4.** The district court similarly elected not to discuss defense counsel's performance in its order denying Tavares's section 2255 motion. App. 242. Because it determined the lack of prejudice was dispositive, it was not obliged to address the question of performance. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70.

fendant's testimony gives the jury the opportunity to assess his demeanor and credibility. *See Nichols,* 953 F.2d at 1553; *United States v. Walker,* 772 F.2d 1172, 1179 (5th Cir.1985). And in a case where the fact of the crime is conceded but the defendant's involvement is the disputed issue, the defendant's testimony "must be considered of prime importance." [5] *Walker,* 772 F.2d at 1179; *see also Nichols,* 953 F.2d at 1553.

■ We believe, however, that it would be unwise to adopt, as Tavares urges upon us, a rule under which defense counsel's performance resulting in the denial of the defendant's right to testify constitutes prejudice *per se.* In some cases, the defendant's testimony would have no impact, or even a negative impact, on the result of his trial. *See, e.g., Payne,* 78 F.3d at 346 (concluding that defendant's decision not to testify based on counsel's advice was not prejudicial); *see also Ortega v. O'Leary,* 843 F.2d 258, 262 (7th Cir.) (finding harmless error trial judge's refusal to allow defendant to testify), *cert. denied,* 488 U.S. 841, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988); *Wright v. Estelle,* 549 F.2d 971, 974 (5th Cir.1977) (finding harmless defense counsel's refusal to allow defendant to testify), *aff'd en banc,* 572 F.2d 1071 (5th Cir.), *cert. denied,* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978). *But see United States v. Butts,* 630 F.Supp. 1145, 1148 (D.Me.1986) (holding that denial of defendant's right to testify "can never be treated as harmless error"). A more reasonable approach, and one in keeping with *Strickland's* two-part test, is to continue to assign special significance to the defendant's precluded right to testify and at the same time to inquire whether it is reasonably probable that the defendant's testimony would have changed the outcome of the trial in his favor.

■ To assess whether prejudice occurred in this case, we assume (as the district court's order and the government's brief do) that absent his counsel's actions Tavares would have testified and that his testimony would have been as he describes in the affidavit accompanying his reply to the government's opposition to his section 2255 motion. *See United States v. Green,* 680 F.2d 183, 189 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1204, 75 L.Ed.2d 445 (1983). Tavares states that he would have denied ownership (and knowledge) of the record albums found in his apartment, including the one containing the large quantity of LSD doses. App. 232. As the government points out, however, Tavares's girlfriend Helou effectively made this point for him by testifying that she had not previously seen record albums or a record player in his apartment. App. 77–78. Tavares also argues that his testimony would have constituted evidence upon which the jury could have concluded that he was only a small-time seller and that Johnson was his large-scale supplier but, as the district court observed, his assertion that Johnson was involved in the June 12 sale is of minimal importance. Tavares does not contest that he is guilty of the June 12 offense. As to the June 21 offense, whether Johnson was also in the LSD distribution business is at best marginally relevant to the issue of who owned the LSD doses found in Tavares's apartment.[6] In any event, even without Tavares's testimony, the jury heard Helou testify that Tavares had told her the LSD in his apartment belonged to Johnson. As the district court found, Tavares's proposed testimony would have been largely cumulative and, to the extent it was not cumulative, largely peripheral.

Even if Tavares could have contributed something new and substantive to his de-

---

**5.** Tavares does not contest that whoever possessed the 8,440 doses of LSD violated the law, arguing instead that he was not that person. Appellant's Br. 27.

**6.** We note as well that Tavares's proposed testimony regarding the LSD found in his apartment has been revised on appeal. Tavares states in the affidavit he submitted to the district court that he would have testified that he "had no knowledge that any drugs were hidden in [his] house" and that he "did not know that LSD was hidden inside one of the albums (or anywhere

else in [his] house)." App. 232. In keeping with his theory on appeal that he was only a small-time dealer, however, he now asserts that he would have admitted the 141 doses found in his bedroom were his and he knew they were hidden there. Appellant's Reply Br. 10 ("Mr. Tavares's proffered testimony was not that he did not know about the 141 doses of LSD in his bedroom, but rather that he did not know that the 8440 doses were hidden in the album or that those doses were hidden anywhere else in the house.").

fense, the evidence of his guilt of possessing the 8,440 doses of LSD found in the record album in his house was so strong that there is no reasonable probability his testimony would have altered the outcome of the trial. For example, given Tavares's own proposed admission that he sold 1,000 doses of LSD in a single transaction on June 12, it seems unlikely that the jury would have believed that the 141 doses found in his bedroom were his only supply. Most damning are Tavares's recorded statements that he had a large supply of LSD and that he had just received a supply of LSD doses in the yin-yang design (the design of the 8,440 doses found in the record album cover) that had been produced by the thousand. It is not reasonably probable that the jury, having heard those statements, would have believed that the doses found in Tavares's living room did not belong, at least jointly, to Tavares.

We conclude that given the facts of the case even the defendant's own testimony would not have influenced the outcome of his trial.[7] Accordingly, Tavares's conviction and the district court's denial of his motion to vacate his sentence based on ineffective assistance of counsel are

*Affirmed.*

---

7. Tavares also argues that the district court should have held an evidentiary hearing to resolve factual questions. Because the district court assumed Tavares would have testified as he claimed when it ruled on his section 2255 motion, there was no need for an evidentiary hearing. *See Green,* 680 F.2d at 189.