**Willis Mark HAYNES Petitioner**

v.

**UNITED STATES of America Defendant**

**No. CIV. PJM 02–3850, CRIM. PJM 98–0520.**

United States District Court, D. Maryland.

July 26, 2006.

Joshua R. Treem, Esquire, Baltimore, L. Barrett Boss, Esquire, Washington, D.C., for Defendants.

Deborah A. Johnston, Esquire, Sandra Wilkinson, Esquire, Greenbelt, for Plaintiffs.

## OPINION

MESSITTE, District Judge.

Willis Mark Haynes, *pro se,* has filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By A Person in Federal Custody. No hearing is necessary to dispose of the matter. *See* Local Rule 105.6 (D.Md.2001). Having considered the Motion, the Government's

Opposition and Haynes' Reply, the Court DENIES the Motion.

## I.

Following a jury trial, Haynes was convicted of three counts of first-degree murder in violation of 18 U.S.C. § 1111(a), three counts of kidnapping in violation of 18 U.S.C. § 1201(a), and three counts of using a handgun during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). Although the jury could have voted for the death penalty, it chose not to. Haynes eventually received concurrent life terms on the first-degree murder and kidnapping counts, and a forty-five year consecutive sentence on the firearm counts. The Fourth Court affirmed the conviction and sentence, *United States v. Haynes*, 26 Fed.Appx. 123 (4th Cir.2001), and the Supreme Court denied certiorari. *Haynes v. United States*, 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002).

## II.

The present Motion alleges four grounds for relief: 1) ineffective assistance of trial and appellate counsel; 2) deprivation of due process based on the Government's alleged use of perjured testimony; 3) the Court's lack of jurisdiction over the kidnapping offenses; and 4) a medley claim involving supposedly new evidence, factual innocence, *Brady* violations and assorted due process violations.

## III.

To demonstrate ineffective assistance of counsel, a petitioner must satisfy both prongs of the test formulated in *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):(1) that counsel's performance fell below an objective standard of reasonableness and, (2)

that the deficient performance prejudiced the outcome of the trial. *See Roach v. Martin*, 757 F.2d 1463, 1476–77 (4th Cir. 1985). A strong presumption exists that counsel performed within a wide range of professional competence; prejudice will be found only when the claimant can "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Haynes has asserted multiple reasons why he believes his trial and appellate counsel were ineffective—all fail the *Strickland* test.

## A.

He first asserts that trial counsel were ineffective when they conceded his guilt at trial despite his explicit instructions that they not do so.[1] The Government counters that this was a reasonable tactical decision on the part of counsel, put forth so that the jury might return a lesser verdict (*e.g.* second degree murder) and a lesser sentence than the death penalty. Specifically, the Government argues that counsel conceded Haynes' guilt in order to pursue an "automatism" defense, *i.e.* to be able to argue that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin John Higgs.

The Fourth Circuit has observed that "there is a distinction which can and must be drawn between … a tactical retreat and … a complete surrender," *Clozza v. Murray*, 913 F.2d 1092, 1099 (4th Cir. 1990); that "some remarks of complete concession may constitute ineffective assistance of counsel, but tactical retreats may be reasonable and necessary within the

---

1. In opening remarks to the jury, counsel stated that Haynes was the triggerman in all three murders.

context of the entire trial, particularly when there is overwhelming evidence of the defendant's guilt." *Bell v. Evatt,* 72 F.3d 421, 429 (4th Cir.1995). *See also Underwood v. Clark,* 939 F.2d 473, 474 (7th Cir.1991) (explaining that "acknowledgment [of guilt] can be a sound tactic when the evidence is indeed overwhelming ... and when ... there is an advantage to be gained by winning the confidence of the jury").

Overwhelming evidence of Haynes' guilt in committing the murders was unquestionably present in this case. Victor Gloria, an eyewitness, testified that he saw Haynes shoot and kill all three victims on the side of the road at the Patuxent Wildlife Refuge.[2] Haynes himself provided detailed written and oral statements describing the events leading up to the murders, culminating in his admission that he shot all three victims with a .38 caliber gun. Finally, the jury heard testimony of Gerald Vaughn, who had been housed in the county detention center with Haynes while Haynes was awaiting trial. Vaughn testified that Haynes confided in him on several occasions that "he killed those bitches" using the ".38," and that he "shot one of them in the head." Vaughn also testified that Haynes told him that he (Haynes) should have killed "Vic," obviously referring to Victor Gloria who was preparing to turn state's evidence against him.

For Haynes to claim that counsel was ineffective for conceding his guilt at trial is remarkable, to say the least. In light of the overwhelming evidence of his guilt, counsel adopted a totally rational course; they conceded their client's guilt in order to fight for his life. And, most impressive-

ly, their strategy worked. Whereas in a later trial a different jury voted that Haynes' co-defendant Higgs should be put to death, Haynes' jury voted to spare his life. Conceding Haynes' guilt was a sound "tactical retreat," hardly a "complete surrender." *Clozza,* 913 F.2d at 1099. Since Haynes is unable to satisfy the first prong of *Strickland,* namely that counsel acted in sub-standard fashion, it is unnecessary to address the second, prejudice, prong. Even so, given the surfeit of evidence against him, there was virtually no chance that contesting the evidence of Haynes' guilt would have altered the outcome of the trial.

■ Still, Haynes argues that his attorneys' decision to admit his guilt was made "unilaterally," against his "unequivocal instructions." Haynes' credibility on this point is doubtful, since in the present Motion he also argues that "counsel mislead [him] by advising [him] that this particular defense strategy was a viable defense." But whatever Haynes might have told counsel, that is not the end of the matter. As the First Circuit said in *U.S. v. McGill,* 11 F.3d 223 (1st Cir.1993):

> Counsel's decision not to abide by the wishes of his client has no necessary bearing on the question of professional competence; indeed, in some instances, listening to the client rather than to the dictates of professional judgment may itself constitute incompetence.

*Id.* at 227.

Had counsel followed their client's instructions in the present case, assuming Haynes is telling the truth, he might

---

**2.** Gloria, a co-defendant, entered a plea and testified against Haynes and Higgs at their respective trials. He stated that he saw Higgs pull a .38 caliber gun out and hand it to Haynes. While handing the gun to Haynes, Higgs told Haynes, "you better make sure they're dead." Haynes then exited the car

and fired five shots. After hearing the first shot, Gloria wiped off the rear window and observed Haynes shoot Tamika Black in the chest and Mishann Chinn in the back of the head. Both Black and Chinn were shot twice, once in the heart and once in the back.

well have ended up with a jury verdict condemning him to death. He was the triggerman in the three murders as established by his own confession and the testimony of Victor Gloria and Gerald Vaughn. Evidence of his guilt was virtually conclusive. Counsel's professional judgment to concede guilt, even if in conflict with Haynes' position, was not substandard nor, given the mountain of evidence of Haynes' guilt, was there any prejudice to him in the *Strickland* sense.

### B.

■ Haynes' claims that counsel was ineffective for failing to challenge the Government's comparative lead bullet analysis at trial. The Government's expert witness, FBI Special Agent Kathleen Lundy, testified that the bullets used to kill the victims in this case were the same as those Haynes had used in another shooting.[3] He faults counsel for not cross-examining Lundy or offering testimony in rebuttal. Haynes states that the evidence presented by Lundy was "actually bogus science which has come under attack by numerous defense counsels and criminal courts across the country." He further notes that in 2003, subsequent to Haynes' trial before this Court, Lundy pled guilty to giving false testimony about bullet composition at a pretrial motions hearing in a case in Kentucky.[4]

All these claims fail the first prong of *Strickland.*

As the Government argues, conceding Haynes' guilt was central to counsel's reasonable strategy of "coming clean" with the jury and fighting to keep Haynes off death row. It obviously would have undermined that strategy if counsel had sought to challenge the ballistics evidence with respect to those murders. Either Haynes committed the murders or he did

---

3. Haynes was previously prosecuted in connection with what was termed the "Cherry Lane Shooting," where he admitted to having fired nine shots at a man he suspected of having had relations with his girlfriend (no one was injured). A .38 caliber bullet was recovered from that crime scene which Special Agent Lundy testified was "analytically indistinguishable" from the .38 caliber bullets recovered from the murder scene in the instant case.

4. The Associated Press issued the following report on or about April 29, 2003:

LEXINGTON, Ky. (AP)—An FBI scientist will plead guilty to lying during testimony she gave at a hearing about a 1994 Kentucky slaying, her attorney said Tuesday. "There is going to be a guilty plea," attorney Larry Roberts said. The case was continued until June because the scientist, Kathleen Lundy, was out of state.

Lundy served as an expert witness who used chemical comparisons to link lead bullets to suspects. In this case, she testified against Shane Ragland, who was convicted last year of gunning down University of Kentucky football player Trent DiGiuro in 1994.

At a pretrial hearing, Lundy said a company melted its own bullet lead until 1996, when the company actually had stopped in 1986.

She corrected her testimony during the trial and told her supervisors in Washington that she had lied. Tom Smith, who is prosecuting the case, said it was his understanding that Lundy is on leave from the FBI.

In January, Circuit Judge Thomas Clark said Lundy's false testimony would not have altered the course of the case against Ragland.

Federal authorities decided not to prosecute her, but Kentucky prosecutors brought a misdemeanor charge of false swearing, a misdemeanor that carries a maximum sentence of 90 days in jail and a $250 fine. Roberts declined to say why Lundy chose to plead guilty.

"I cannot explain why I made the original error in my testimony ... nor why, knowing that the testimony was false, I failed to correct it at the time," Lundy wrote in a sworn affidavit to Justice Department officials. "I was stressed out by this case and work in general."

not. Challenging the ballistic evidence would at best have confused the jury as to that defense. Under comparable circumstances, the Fourth Circuit rejected a claim of ineffective assistance after counsel made a strategic decision not to cross-examine an expert with respect to the reliability of bullet composition evidence. *See Huffington v. Nuth,* 140 F.3d 572, 582 (4th Cir.1998) (noting that because counsel's strategy involved asserting that his client was not even present during the commission of a crime, attacking the expert testimony on ballistic evidence would do little to advance that strategy).

For the same reason, Haynes' "bogus science" assertion provides no succor. Nothing would have been gained by disputing the similarity of the bullets if the fact that Haynes was the shooter was admitted. Beyond that, while the comparative lead analysis Lundy employed may have been subject to criticism since Haynes' trial, it was a widely accepted technique in federal and state courts as of that time. *See, e.g., United States v. Davis,* 103 F.3d 660, 673 (8th Cir.1996), *cert. denied* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997); *State v. Noel,* 157 N.J. 141, 723 A.2d 602 (1999). Counsel cannot fairly be deemed ineffective if they chose not to dispute the conventional scientific wisdom of the time.

Then, too, because it would have been inconsistent with the concession that Haynes was the shooter, the fact that Lundy may have later confessed to making material misstatements in a separate, unrelated trial in no way demonstrates any failure on counsel's part to aggressively pursue Haynes' interests at Haynes' trial. No one could have foretold what Lundy might later admit to nor is there any evidence that Lundy in fact lied at Haynes' trial.

Counsel's tactical decisions to pursue certain trial strategies, including whether to cross-examine opposing witnesses, fall within the "wide range of professionally competent assistance" afforded under *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Not examining Lundy was a professionally sound decision. Haynes has not shown that he was prejudiced by the decision, nor could he do so. The ballistics test was not necessary to prove Haynes' guilt in the triple murder. His own confessions, as well as the eye-witness testimony presented by Victor Gloria and the statements made to Gerald Vaughn more than sufficed to establish Haynes' guilt beyond a reasonable doubt.

### C.

Haynes next faults trial counsel for not advising him about the possibility of waiving conflict-free representation, *i.e.* for not telling him he could keep his original trial counsel if he agreed to waive any conflict of interest on counsel's part. The short of the matter is that the factual premise of this claim is simply untrue. As the Government points out, Haynes was not only fully advised as to the matter, he was given an extensive court hearing with respect to it.

Haynes was initially represented by Assistant Federal Public Defender John Chamble, who sought to withdraw against Haynes' wishes after the Defender's Office identified a potential conflict of interest in the case. Specifically, the Defender's Office had previously represented Gerald Vaughn who, as indicated, was in a position to testify that Haynes had confided to him that he (Haynes) committed the murders for which he was on trial. At the time that the Defender's Office through its Motion to Withdraw advised the Court of the existence of the conflict, which was filed several months in advance of trial, Haynes had not yet conceded his guilt. Had he persisted in his plea of not guilty

through trial, which it appeared likely he would do, and had the Defender's Office remained as his counsel, they would have been in a clear conflict situation. They would have had to cross-examine Vaughn, attempting to impeach him, while in possession of information that Vaughn as their former client had communicated to them in confidence.

All of this was made pellucidly clear to Haynes as soon as the Defender's Office sought to withdraw. The Court went so far as to appoint special counsel to meet with Haynes and advise him with respect to the conflict of representation issue. At a hearing with Haynes present in the courtroom, special counsel informed the Court that, "I talked with my client. He would waive any future conflict at this time to maintain his attorney-client relationship with Mr. Chamble." Clearly, therefore, counsel had discussed the issue of conflict-free representation with Haynes, belying any claim that Haynes was not advised with respect to the issue.

It is true that Haynes indicated his wish to waive the conflict. The Court, however, due to its concern over the serious potential for unforeseeable conflicts arising in the future, refused to permit this.[5] Among other things, Haynes was not prepared to make a *full* waiver. As the Court noted:

> It should be clear that Mr. Haynes himself, spoken through Mr. Irwin, does not agree to the withdraw [*sic*] of counsel and particularly has emphasized his rapport with Mr. Chamble, and Mr. Chamble agrees that that rapport exists. Mr. Haynes has been very clear that he does

not want to give up Mr. Chamble as his lawyer, and the parties have stipulated that if he were asked, he would voluntarily waive any conflict understood as of now, *but obviously unable to say or frankly, in the Court's view, to commit himself now and forever for any possible conflict that might arise.*

(Emphasis added).

Beyond that, it was not within Haynes' power alone to decide the matter. Without a waiver of the attorney-client privilege by Vaughn (who was no longer represented by the Public Defender's Office, but by private counsel), the Defender's Office was not even in a position to disclose to the Court what it knew about Vaughn or the extent to which what it knew might create a conflict when Vaughn was called to testify in Haynes' case where the Defender's Office would be obliged to cross-examine him. But Vaughn's counsel was present at the hearing on the Defender's Motion to Withdraw in Haynes' case and Vaughn's counsel refused to waive Vaughn's attorney-client privilege with the Defender's Office.

The Court thus explained its rationale for denying the waiver and granting Haynes' counsel's motion to withdraw:

> [H]aving reviewed this, the Court is going to grant the motion to withdraw because it seems to me that either way the Court is in a dilemma. If I don't grant the motion, we will come to a very possible conflict down the road which will completely turn the case inside out and make us start all over again hereafter. So the better part of wisdom,

---

5. As for the Court's authority to reject a proffered waiver of counsel's conflict of interest, see generally *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Disqualification of counsel over objection has been sustained in settings comparable to that in the present case. *See, e.g., United States v. Mays,* 69 F.3d 116 (6th Cir.1995) (defense

counsel previously represented prosecution witness on related matter); *United States v. Baker,* 10 F.3d 1374 (9th Cir.1993) (defense counsel previously represented prosecution witness in unrelated matter; impeachment might be hampered based on confidential knowledge).

where the choice is difficult, is to say now before things go any further along, that the defendant should be represented by someone other than the Defender's Office.

For the present purposes, whether the Court was correct in not permitting a waiver is not the issue. The claim before the Court is that counsel failed to inform Haynes with respect to the possibility of a conflict-free representation waiver, a claim that the record sharply refutes. The record also refutes Haynes' claim that trial counsel did not properly preserve the issue for appellate review. Clearly the issue was preserved.

Haynes' claim that appellate counsel should be faulted for not arguing the issue on appeal is equally meritless.

 Counsel are not required to raise every non-frivolous issue on appeal, much less every frivolous issue. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Limiting the issues to the stronger or strongest ones while winnowing out the weaker is sound appellate strategy. *Id.* at 751–61, 103 S.Ct. 3308. Haynes must demonstrate, per *Strickland*, that appellate counsel's failure to raise the issue of choice of counsel at trial fell below the standard of reasonable attorney conduct and that this omission was prejudiced to him. He has done neither.

Appellate counsel could fairly have judged that the choice of counsel issue was at best weak, hence that it should not be pursued on appeal. Nor can it be said that the failure of counsel to have argued the issue caused Haynes any prejudice. The attorneys that Haynes was eventually given (following the appearance and withdrawal of special "conflicts" counsel) achieved an extraordinary result—they

saved him from the death penalty in the face of overwhelming evidence that he and his confederates senselessly and brutally shot three defenseless young women "in an area of woods, where there were no streetlights, and [where] it was completely dark." *Haynes,* 26 Fed.Appx. at 127.

## D.

Haynes claims that counsel was constitutionally ineffective in failing to argue, when moving to suppress his confession, that he was subjected to "police brutality and psychological and emotional torment."[6] This claim, as the Government argues, is procedurally barred.

On appeal, Haynes argued that this Court committed reversible error by denying his motion to suppress. The Fourth Circuit examined the circumstances under which the confession was obtained, and found *inter alia* that "there [was] no evidence that the officers used violence or improper threats or promises to elicit [his] statements." *Haynes,* 26 Fed.Appx. at 134.

 Since Haynes received a full and fair opportunity to litigate the circumstances surrounding his confession both at trial and on direct appeal, he cannot relitigate the issue in a § 2255 motion. *See Boeckenhaupt v. United States,* 537 F.2d 1182, 1183 (4th Cir.1976) (claims fully considered on direct appeal cannot be reconsidered on collateral attack); *Herman v. United States,* 227 F.2d 332 (4th Cir.1955) (§ 2255 motion may not raise questions that were fully considered on appeal).

## E.

 Haynes claims that counsel were ineffective because they failed to request a competency hearing before trial, with the

6. Counsel moved to suppress the confession, alleging the absence of *Miranda* warnings and involuntariness of the statements. The Motion was denied by the Court.

result that he was tried while incompetent. This issue was not raised on direct appeal; hence Haynes is also procedurally barred from raising this issue. *Ludwig v. United States,* 162 F.3d 456 (6th Cir.1998) (petitioner who procedurally defaulted a competency claim was procedurally barred from raising the claim in post-conviction proceedings unless he could show cause and prejudice or actual innocence).

 Haynes has shown neither cause nor prejudice in connection with counsel's failure to request a competency hearing. *See Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A competency hearing is required only if the court has "reasonable cause" to believe that a defendant has a mental defect rendering him incompetent. *United States v. Sovie,* 122 F.3d 122, 128 (2d Cir.1997); *United States v. Nichols,* 56 F.3d 403, 414 (2d Cir.1995). *See also* 18 U.S.C. § 4241(a).[7] A determination that a defendant is incompetent is typically based on a psychiatrist's evaluation or the Court's own observations. *See United States v. Mason,* 52 F.3d 1286, 1290 (4th Cir.1995); *Nichols,* 56 F.3d at 414. The Court may also rely on the judgment of defense counsel that the defendant is incompetent. *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986).

 There was no reasonable cause to question Haynes' mental competency in this case. He reported no history of mental or emotional problems. His behavior leading up to and during his trial, as personally observed by the Court, gave no indication that he might be incompetent or unable to understand the proceedings against him. No medical opinion concerning his alleged lack of competence was ever introduced. In short, all indicators pointed towards Haynes' competency to stand trial. Counsel cannot be faulted for failing to request a competency hearing when there was no reasonable basis to do so. And, as before, there is no sense in which this omission "worked to [the defendant's] actual and substantial disadvantage, infecting his entire trial with an error of constitutional dimension." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Haynes, of course, has offered no evidence that he might actually be innocent of these crimes.

### F.

Haynes faults counsel on the ground that the "automatism" defense argued by them "lacked both factual and legal foundations ... there was [no] psychiatric evidence to support this mental defense." He also says counsel misled him "by advising [him] that this particular defense strategy was a viable defense and would benefit [him] by allowing the jury to find him not guilty based on this mental disassociation/diminished capacity defense.... Counsel should have presented a proper and cognizable insanity defense." The Government disputes each of these assertions and the Court agrees that all lack merit.

Taking the last assertion first—that counsel should have put forward an insani-

---

7. The statute provides,

At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a).

ty defense: For the same reason that the Court rejects the argument that counsel failed to pursue a competency hearing—namely that there was not the slightest indication that Haynes suffered from a mental defect or was *non compos mentis* at the time of the murders or at the time of trial—the Court rejects the argument that counsel were remiss in not pursuing an insanity defense.

As for the lack of legal or factual foundation for the "automatism" defense, that is simply an inaccurate statement. Automatism has been recognized by courts as a valid defense bearing on the voluntariness of an otherwise criminal act. *See, e.g.,* John Parry & Eric Y. Drogin, *Criminal Law Handbook on Psychiatric Psychological Evidence and Testimony*, 155–56, 174–75 (Am. Bar Ass'n, ed.2000) [hereinafter *Criminal Law Handbook* ]. While "automatism" does not appear in the internationally used diagnostic manuals, the DSM–IV (Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Am. Psychiatric Ass'n 2000)) or the ICD–10 (International Classification of Diseases (10th Rev., World Health Org.2006)), the term is used in practice in a variety of contexts, *e.g.* sleepwalking, hypnosis, and post-traumatic stress disorder. *Criminal Law Handbook, passim.*

On the other hand, "automatism" also has a meaning in common parlance where it refers to the "performance of acts by an individual without his awareness or conscious volition." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 101 (1994). With or without expert testimony, arguing that condition is something that counsel in a case with multiple defendants is frequently able to do. A younger weaker confederate may be so dominated by an older, stronger confederate that the younger, weaker conspirator may be said to have undertaken an action more or less "involuntarily." As a result,

it can be argued that he has acted without the necessary criminal intent, even if not acting while insane or in a certifiable medical sense.

In the present case, the Court understands counsel to have relied on this more colloquial concept of "automatism." Again, psychological indicia suggesting the need for expert testimony on this point simply were not present. But that counsel vigorously undertook to establish the dominance of Higgs (the non-shooter) over Haynes (the shooter) can hardly be gainsaid. Counsel derived the maximum benefit out of the defense that could reasonably be expected, emphasizing it where it really had a chance to persuade—in the penalty phase—but not pressing it where it had little or no chance to persuade—in the guilt phase.

Finally, as to Haynes' contention that counsel told him that the automatism defense might result in his outright acquittal, the Court seriously doubts that counsel would ever have spoken thus, given the sharp inconsistency that such advice would have had with the decision to admit Haynes' guilt and focus on the more critical issue of his life or death. Perhaps Haynes misunderstood what counsel told him about automatism. In light of the evidence, any chance for outright acquittal based on the automatism defense was essentially nil.

Nor was Haynes prejudiced insofar as the automatism defense argued by counsel was concerned. The fact of Higgs' dominance over him—such that Haynes the shooter was spared the death while Higgs the manipulator was not—was not lost on the jury. As developed by counsel, the automatism defense ultimately worked very much to Haynes' benefit.

### G.

Haynes claims that counsel's use of the automatism defense opened the door to

prejudicial testimony by Government witnesses. The Government finds this claim incomprehensible since Haynes does not specify what prejudicial testimony he is referring to. Haynes responds, again without specifying the testimony he believes was prejudicial, that but for his counsel's application of the automatism defense, the Government never would have called certain witnesses who allegedly presented evidence prejudicial to him.

 *Strickland* places the burden on a petitioner to prove that counsel's assistance was inadequate and that, but for these inadequacies, "the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. Vague allegations of prejudicial testimony, without specifics as to the challenged testimony, do not suffice to demonstrate counsel's deficient performance under *Strickland.* Haynes refers to the testimony of Nikkia Jackson and Gerald Vaughn as somehow having been brought on by counsel's introduction of the automatism defense. In fact the testimony of these witnesses had little if anything to do with that. Jackson linked Haynes' co-defendant Higgs to her sister Tanji, one of the murder victims, while Vaughn disclosed Haynes' jailhouse boast that he had killed the young women and ought to have killed Victor Gloria. This evidence was fully relevant to the Government's case-in-chief. The only sense in which this evidence "harmed" Haynes was that it tended to establish his guilt. In no other respect was it prejudicial, certainly not in the constitutional sense.

### H.

 Haynes argues that trial counsel improperly advised him not to testify at trial and that he was prejudiced as a result. He asserts that had he been properly advised as to this right, he would have testified, which would have been to his benefit. To be precise, Haynes does not claim that he was *not* advised in this respect. What he says is that counsel "unduly influenced [his] decision" not to testify, which amounted to "ineffective assistance and deprivation of his right to take the stand in self defense." The Government submits that without knowing what Haynes might have testified to, it cannot begin to respond to this claim.

 The Supreme Court has held that a defendant in a criminal trial has a constitutional right to testify on his own behalf. *See Rock v. Arkansas,* 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Equally clear is counsel's obligation to inform him of that right. *See Sexton v. French,* 163 F.3d 874, 882 (4th Cir.1998). In the present case, however, the record reveals not only that counsel advised him of his right, but that the Court itself informed Haynes about the right and independently offered him the opportunity to exercise it. Haynes declined to do so. Now, in his Motion, he asserts that his decision was tainted by bad advice from counsel.

The claim does not withstand *Strickland* analysis. First, Haynes fails to indicate what his testimony would have been and how it would have benefitted him. Without this information, it is impossible to assess the impact of his not testifying and whether that might have prejudiced the outcome of the case. Second, given Haynes' criminal history, the welter of evidence against him, his exposure to potentially damaging cross-examination, and the negative consequences were he to perjure himself, counseling him not to take the stand can only be seen as sound legal strategy. Third, the Court notes that there is authority to the effect that even counsel's total failure to advise a defendant of his right to testify does not constitute prejudice per se. *United States v. Tavares,* 100 F.3d 995, 998 (D.C.Cir.1996),

*cert. denied,* 520 U.S. 1160, 117 S.Ct. 1344, 137 L.Ed.2d 502 (1997). Finally, in view of the weighty evidence against him, there was no reasonable probability that, had Haynes testified, the outcome of the trial would have been different.

## I.

Haynes claims that counsel failed to properly preserve for appellate review the alleged Government "intimidation" of defense witnesses, one of whom was a "defense expert and mitigation specialist."

Again the Government states that it has "no idea" what Haynes is referring to or what such a defense expert might have testified to at trial and the Court itself is similarly at sea as to this claim. Haynes, quite simply, has made no *Strickland* showing in this regard—either as to the quality of counsel's performance or as to the constitutional prejudice he supposedly suffered.

## J.

Haynes claims that counsel were ineffective in stipulating to federal jurisdiction to prosecute the offenses he was charged with, particularly the kidnapping charges. He says that there is "no substantive evidence that the spot where the murders took place was in fact located on federal national lands."

■ The Court agrees with the Government that this claim is baseless. There can be no doubt that the murders in question took place on federal land, more particularly the Patuxent Wildlife Refuge in Prince George's County. To the extent that Haynes means to argue that the kidnapping did not occur on federal land, as opposed to the point in Maryland where Haynes and his cohorts first picked up the victims in Higgs' vehicle, the Court relies on 18 U.S.C. § 1201(a)(2) [8] as interpreted by the Fourth Circuit in *United States v. Hughes,* 716 F.2d 234, 238 (4th Cir.1983). That authority stands for the proposition that, while a kidnapping is complete upon the unlawful seizing and detention of the victim, federal jurisdiction attaches once the victim is transported onto federal land.

Counsel's stipulation of federal jurisdiction was therefore sensible, conceding an obviously indisputable point which might otherwise might have been ill-received by the jury.

Again, Haynes has failed to show any prejudice in the constitutional sense.

## K.

Haynes contends that trial counsel ineffectively failed to object to the Court's jury instructions with respect to the definitions of "malice aforethought," "intent," and "premeditation," specifically that the Court's definitions "confused the fact finders and allowed them to find [him] guilty of premeditated murder based on evidence that did not support such a finding." Here, too, Haynes fails to be specific, in this instance failing to delineate the respects in which the instructions incorrectly stated the law or might have confused the jury.

---

**8.** In relevant part, the statute provides,

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
>
> . . .
>
> any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
>
> . . .
>
> shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a)(2).

In any event, the record belies these allegations. Defense counsel, for example, objected to the Court's instructions as to malice, stating that "we do have an objection to [jury instruction 35] ... I see how it defines malice, but it doesn't give any meaning to the word 'aforethought.'" As a result of this challenge, the Court, defense counsel and the Government worked through a definition that was more satisfactory to defense counsel. That counsel did not raise this issue on appeal may well have been because, in their judgment, it had been fairly resolved at trial and/or because they concluded that the Court's instructions on the terms at issue were a proper statement of the law. Omitting this issue on appeal has not been shown to have been an unreasonable strategy.

### L.

Haynes says appellate counsel were ineffective for not challenging what he characterizes as a "tainted verdict." Specifically, he says that the jury verdict was improperly "leaked" to the public by court officials prior to its release to either the Court, his counsel or himself. As the Government points out, however, Haynes omits to indicate the nature of the so-called "leak" which, when examined, shows the meritlessness of the claim.

▮ Two court security officers sitting outside the jury room were told by the jury foreman that the jury had reached a verdict (but not what the verdict was) and from that report several people *within the courthouse* learned the same thing—all this before the Court itself learned that there was a verdict and could advise counsel or Haynes.

Before the actual verdict was taken, this issue was the subject of intense scrutiny by the Court and counsel, with Haynes present. In fact, after being advised of the matter by the Court, defense counsel seriously contemplated moving to strike the verdict such that the Court convened an immediate mini-hearing at which counsel were given leave to interrogate the two court security officers involved. After the interrogations were completed, counsel consulted with Haynes and decided that the security officers had "acted exactly according to their protocol." Counsel therefore concluded that there was no sense in which the so-called "leak" had "tainted the verdict" and made no motion with respect to it. The fact that counsel failed to raise this issue on appeal is hardly surprising since the record plainly shows that the actions of the security officers were neither unlawful nor improper. Yet again, no *Strickland* issue is implicated.

### M.

Haynes' argument that trial counsel should have objected to the fact Haynes was not present at a pretrial motion hearing on April 8, 1999, has been withdrawn.

### N.

▮ Haynes says that counsel ineffectively failed to challenge the legality of statements he made to police in the Cherry Lane case, in which a bullet comparable to bullets in the present case was found. He says that these statements were procured in violation of his *Miranda* rights and that counsel should have challenged their constitutionality when the Government introduced them into evidence in this case. The Government contends that the statements in the Cherry Lane case were procured from Haynes in connection with his plea hearing in that case, where Haynes was represented by counsel and where the court explicitly informed him of his relevant rights. Haynes says the statements he objects to were not made in connection with his plea in the case, but rather to police prior to entering the plea. However, inasmuch as he has introduced no evidence on this point, the Court must

accept the record evidence which reflects that the statements were made in connection with the plea agreement in the Cherry Lane case. Again, Haynes has failed to demonstrate ineffective assistance of counsel.

### O.

Haynes alleges that both trial and appellate counsel failed to properly pursue a motion to change venue, which he says was necessary because "pretrial publicity" had poisoned the jury pool. Again, Haynes is contradicted by the record. Trial counsel ably presented a motion to change venue, which was rejected by the Court based on the following rationale:

> there is a presumption that a defendant can get a fair trial from the locale where the event occurs.... It is, [the Court] would suggest, highly unlikely that in the jury pool there would be a widespread opinion that the defendants were guilty or that the jurors could not put aside some prejudice.... the motion for a change of venue is denied.

Voir dire of the jurors in the case confirmed the Court's view. Trial counsel cannot be deemed ineffective simply because the Court disagreed with them. With respect to the complaint that appellate counsel failed to pursue this issue on appeal, Haynes fails to show that this was anything other than a tactical decision not to raise every non-frivolous issue on appeal. *Smith v. Murray*, 477 U.S. 527, 534–35, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

### P.

As elaborated upon in his Reply, Haynes claims ineffective assistance insofar as counsel did not object when the Government introduced an unspecified "aggravating factor" to enhance his sentence beyond the statutory maximum penalty for kidnapping, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). While it is not clear which particular aggravating factor Haynes has in mind, what is clear is that the statutory maximum penalty under the kidnapping resulting in death of the victim, is death or life imprisonment. 18 U.S.C. § 1201(a). Consistent with that statute, Haynes received concurrent sentences of life imprisonment on the kidnapping counts.

There was thus no *Apprendi* problem and there can be no issue of ineffective assistance based on counsel's lack of objection.

### Q.

Haynes claims that trial counsel failed to object to the Court's refusal to permit him to stipulate to the Cherry Lane incident. He says this failure allowed the Government to "sling unnecessary prejudicial mud upon [him] at trial." The Government argues that, although presented under the umbrella of ineffective assistance of counsel, this claim is nothing more than an effort to collaterally raise an issue that has already been dismissed at the appellate level. The Court agrees that the claim is procedurally barred.

In fact, counsel did object to the admission of evidence of the Cherry Lane shooting and the Court overruled that objection, in effect rejecting whatever stipulation Haynes was prepared to offer relative to the incident. Beyond that, when Haynes on appeal challenged the propriety of the Court's decision to admit evidence relating to the Cherry Lane shooting, the Fourth Circuit held that, even assuming error, the admission was harmless:

> We need not decide whether the evidence concerning Haynes' prior drug trafficking activities and the evidence concerning the Cherry Lane shooting were admissible under Rule 404(b) because, even if the evidence was not, any error was harmless beyond a reasonable doubt. In considering whether a non-

constitutional error is harmless, the proper test ... is whether we, in appellate review, can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. In applying this test, we must be mindful that it does not ask simply whether we believe that irrespective of the error there was sufficient untainted evidence to convict but, more stringently, whether we believe it highly probable that the error did not affect the judgment.

*Haynes,* 26 Fed.Appx. at 135–36. *See also Boeckenhaupt,* 537 F.2d at 1183.

In other words, Haynes' ineffective claim would be groundless even if counsel had failed to object to the introduction of F.R.E. 404(b) evidence, which in fact they did not fail to do. No *Strickland* issue arises here.

### R.

Haynes combines a number of claims that he alleges constitute ineffective assistance of counsel "generally." The Court has already addressed and rejected as meritless all but a few of these allegations. His new claims—failure to improperly investigate, marshal facts and question witnesses, and cumulative ineffectiveness— are as meritless as the others.

Haynes' attacks on federal jurisdiction, the jurisdictional propriety of the kidnapping counts, counsel's decision to pursue an "automatism" defense, and counsel's "allowance" of the admission of prejudicial evidence under Fed.R.Evid. 404(b), have already been discussed. His new allegations of counsel's failure to properly investigate, "manifest in counsel's inability to effectively cross-examine certain government witnesses," is so vague as to be meaningless. His further allegation that

counsel failed to challenge a videotape re-enactment is, as with other of his claims, belied by record evidence. Counsel in fact objected vigorously to the admission of the tape, which was overruled by the Court. As for the contention that counsel's assorted "errors" had the cumulative effect of denying him effective assistance, the Fourth Circuit has expressly declined to recognize such a claim where, as here, the individual claims of ineffective assistance do not demonstrate constitutional violations. *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir.1998).

### S.

■ Haynes' final ineffective assistance claim faults trial counsel for failing to preserve for appellate review "the trial court's bias against [him] and [the] judge's personal involvement in the case." He says the record is replete with such instances as "most clearly demonstrated at sentencing." That, however, is as specific as Haynes gets. The Government, not surprisingly, finds it impossible to respond to the "vague and conclusory allegations" of the claim and so does the Court. To the extent that the Court, at sentencing, may have expressed sympathy for the murder victims and their families and revulsion at the nature of the crimes, such remarks were entirely appropriate in the context of explaining the sentence it was imposing.

### IV.

■ As his second major ground for relief, Haynes alleges that he was deprived of due process as a result of the Government's use of perjured testimony in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He refers again to FBI special agent Kathleen Lundy's admission of guilt in providing false testimony in a subsequent, unrelated criminal trial.[9]

---

**9.** See Section II:B, *supra.*

To demonstrate a denial of due process, a claimant must satisfy all three prongs of *Brady:* "(1) the evidence must have been favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, *i.e.,* it must have prejudiced the defense at trial." *Monroe v. Angelone,* 323 F.3d 286, 299 (4th Cir.2003). The Supreme Court has recognized that the *Brady* rule:

> ... arguably applies in three quite different situations. Each involves the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense. In the first situation, typified by *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

*United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Despite Haynes' vague suggestion that Lundy may have lied at his trial, he has presented no evidence that would substantiate this claim. The Court accepts that, after Haynes' trial, Lundy pled guilty to giving false testimony in a case in Kentucky.[10] Nevertheless, Haynes has offered no reason to believe that Lundy lied in his case as well.

Additionally, Haynes is unable to satisfy *Brady's* second and third prongs. The allegations against Lundy came to light well after Haynes' trial. Nothing in the record indicates that the Government knew or should have known of any possible perjury on her part at Haynes' trial. Furthermore, it is clear that Lundy's testimony was ultimately immaterial. As the Court has observed several times over, the evidence against Haynes was so overwhelming that he would have been found guilty notwithstanding Lundy's testimony. The determination of his guilt is entirely worthy of confidence. There was no *Brady* violation in respect of the Lundy testimony.

## V.

Haynes' claim that the Court lacked jurisdiction over his case repeats one of his meritless ineffective assistance of counsel claims.[11] It needs no further discussion as an independent claim.

## VI.

Finally, Haynes claims that he is in fact innocent of the crimes of which he was convicted and accuses the Government of having framed him. This claim is fanciful and totally unsupported.

"To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to

---

**10.** See n. 4, *supra.*

**11.** See Section II:J.

731

reach the merits of a barred claim." *Id.* at
316, 115 S.Ct. 851.

Nothing in the record remotely suggests
Haynes' actual innocence of the crimes of
which he was convicted. His doom was
sealed by his own confession, the testimo-
ny of an eyewitness, his disclosures to a
cell mate, and a plethora of physical evi-
dence. There was no miscarriage of jus-
tice in this case.

### VII.

For these reasons, Haynes' Motion pur-
suant to 28 U.S.C. § 2255 will be DE-
NIED.

A separate Order will be ENTERED.